[Civ. No. 35819. Second Dist., Div. Two. Dec. 21, 1970.]

ROCHESTER CAPITAL LEASING CORPORATION,
Plaintiff and Appellant, v.
K & L LITHO CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Martin S. Friedlander and Alvin S. Michaelson for Plaintiff and Appellant.

Sam Houston Allen for Defendants and Respondents.

**OPINION**

ROTH, P. J.—This is an appeal from a judgment rendered against Rochester Capital Leasing Corp. (Rochester), appellant, which as plaintiff

sought damages allegedly arising from the breach of three lease agreements, hereinafter defined, entered into by the various defendants (respondents).

In August 1962, Harry Kater and Milton Lieberman, both defendants in this action, organized defendant K & L Litho Corporation (Litho.) to engage in the business of printing. Messrs. Kater and Lieberman acquired presses and other equipment, financing a large part of the purchase price with the proceeds of a $9,400 note obtained from the Bank of America. In November 1962, an agreement was concluded between Litho and Rochester whereby Litho conveyed title to the presses and equipment and other personal property including those items purchased with money borrowed from the Bank of America, to Rochester. Concurrently Rochester leased the same personal property to Litho. The lease required Litho to pay Rochester $511.38 each month for 60 consecutive months.

Under the lease-back arrangement, Litho retained the use of the presses and the equipment and received from Rochester the sum of $22,728.16. Said sum was disbursed in California through an escrow established by the parties pursuant to a notice given under Civil Code, section 3440. Bank of America and other creditors of respondents were paid and title to the personal property was cleared prior to or concurrently with the sale and lease-back between the parties.

Simultaneously, an identical separate arrangement relating to a single press, title to which was originally vested in Kater Engraving Company (Kater), also a named defendant, was executed with the exception that the payments amounted to $57.33 per month for a period of 60 months.

In March 1963, a further agreement was executed which provided for the advance of $1,230 for the repair of two of the presses. Messrs. Kater and Lieberman obligated themselves to pay $28.41 a month for 60 months under this agreement. (The sales and concurrent lease-back agreements made by the different defendants with Rochester, will hereinafter be referred to as the Rochester agreements.)

In March 1964, the personal property subject to the Rochester agreements was assigned, with the consent of Rochester, to Coast Productions (Coast), a printing business owned and operated by persons other than Kater and Lieberman.

The Rochester agreements provided that the filing of an involuntary petition in bankruptcy against lessees would constitute a breach. In the event of breach, Rochester was empowered by the lease to take possession of the personal property without demand or notice to lessee. No provision was made for the sale of the property. On January 14, 1965, an involun-

tary petition was filed against Coast. Coast as successor-lessee was and had been in arrears since October 15, 1964, in its payments under the Rochester agreements, and was in arrears in its obligations to other creditors. Rochester then proceeded to sell at public auction personal property described in the Rochester agreements. Respondents contended that there never was a proper sale.

The trial court found that the Rochester agreements made in the form of lease-backs were not lease-backs but were transactions representing loans of money made by Rochester to respondents at usurious rates of interest and that the security for such loans was the personal property which respondents conveyed to Rochester.

The finding of the trial court that the Rochester agreements were loans secured by chattels and that the lease-back arrangement disguises the true nature of the transactions is based upon abundant testimony and numerous exhibits. We are guided not ". . . by what the parties appear to be or represent themselves to be doing, but by the transaction as disclosed by the evidence." (*Golden State Lanes* v. *Fox,* 232 Cal.App.2d 135, 139 [42 Cal.Rptr. 568].)

At bench, Litho received $22,728.16 as the alleged purchase price from Rochester upon the execution of the two lease-back agreements relative to the presses and complementary equipment. A third agreement, entered into some months afterwards, called for the repair of certain of the presses and did not provide for any "lease" but merely for periodic payments by Litho. Under all three agreements, Litho bound itself to pay Rochester a total of $35,827.20 over the ensuing five-year period. This amount represents a difference of $13,099.04 between Rochester's payment to Litho, and the latter's total payments under the "lease" agreements.

The total lease payments required from respondents amounted to a sum equal to the original advance referred to as purchase price made by Rochester to respondents, plus interest for the term of the advance or loan. The term of the lease itself was coincidental with the period of time during which the principal sum and the interest thereon were to be paid to the lessor. After the expiration of the original lease period, the lessee had the option to renew, but the payments under the renewed principal lease were to drop sharply to $227.28 per year, a nominal sum in comparison to $6,136.56, the annual payment under the original term of the lease. An option to repurchase the presses does not appear in the record before us; however, the absence of such an option is not, in view of the particular facts of this transaction, determinative. (Project, *California Chattel Se-*

*curity and Article Nine of the Uniform Commercial Code,* 8 U.C.L.A. L.Rev. 806, 827.) It is clear that in substance the parties created a debit and credit relationship which was not terminated until Litho had fully paid the sum borrowed plus interest. ■ Such a debit and credit relationship is, of course, characteristic of a loan. (*Burr v. Capital Reserve Corp.,* 71 Cal.2d 983, 991 [80 Cal.Rptr. 345, 458 P.2d 185].)

On appeal, Rochester does not seriously question that the transactions at bench were in fact loans and the evidence is indisputable that Rochester's money was to be returned at a profit of 11.5 percent per annum.

No evidence was introduced nor is any argument made which would tend to establish that the so-called "rentals" in the Rochester agreements could reasonably or otherwise equate with an amount for which presses and equipment of the kind covered by the Rochester agreements would rent for on the open market. There is, however, testimony to the effect that the "rental" amounts were calculated with an eye upon Rochester's expected rate of return on its investment. In fact, Rochester's course of conduct after Coast's failure to meet its obligations under the Rochester agreements, including the bringing of this action, corroborates the trial court's conclusion that Rochester itself looked upon the transactions at bench as loans.

■ "In determining whether a transaction constitutes a loan, the significant consideration is the substance of the transaction rather than its form or the terminology used by the parties." (*Burr v. Capital Reserve Corp.,* 71 Cal.2d 983, 989 [80 Cal.Rptr. 345, 458 P.2d 185].) ■ A loan is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use. (*Golden State Lanes v. Fox, supra,* 232 Cal.App.2d 135, 138.)

Rochester argues that even if the agreements represented a loan, that since New York was the place for payments to be made, New York was the place of performance and there was no usury since a corporation cannot claim usury in New York (23A McKinney's Laws of New York, § 521(1)), and that the Rochester agreements were in all respects valid. (*Ury v. Jewelers Acceptance Corp.,* 227 Cal.App.2d 11 [38 Cal.Rptr. 376].)

■ Conceding that the Rochester agreements required monthly payments to be made in New York, each of the Rochester agreements was executed in California, the situs of the personal property which formed the security for all the transactions was and remained in the State of California; in addition, the act which effectuated the Rochester agreements

was the payment of the money to respondents in California for the personal property subsequently leased through an escrow executed and completely performed in California.

Finally, all acts by Rochester to enforce its rights of repossession, disposition and to recover the balance of sums due in the event of respondents' failure to make payments or otherwise perform, were exercised in California.

■ Prior to the adoption of the Uniform Commercial Code in California, the general choice of law rule called for the application of the law of the state in which the movable was situated at the time of the transfer of the security interest in the movable. (Rest., Conflict of Laws, ¶ 265; Comment, 47 Cal.L.Rev. 543, 554.) The adoption of Commercial Code, section 9102 did not constitute a departure from prior law. (Uniform Commercial Code Comment 3; 1966 Amendment to Com. Code, § 9102.) Certain California cases to the contrary, notably *Mercantile Acceptance Co.* v. *Frank,* 203 Cal. 483 [265 P. 190, 57 A.L.R. 696], are distinguishable inasmuch as they deal with the special problem of the removal of the personalty from one state to another without the lienholder's consent. Under such circumstances, California courts have refused to apply forum law to defeat the lienholder's rights. (*Mercantile Acceptance Co.* v. *Frank, supra; Motor Acceptance Co., Inc.* v. *Finn,* 124 Cal.App. 766 [13 P.2d 761]; *Atha* v. *Bockius,* 39 Cal.2d 635 [248 P.2d 745].)

■ We conclude therefore that the trial court was correct in applying California law to the Rochester agreements. ■ Under California law, an interest rate of 11.5 percent is usurious. (Cal. Const., art. XX, § 22). ■ While the principal of an usurious transaction is recoverable (*Simmons* v. *Patrick,* 211 Cal.App.2d 383, 389 [27 Cal.Rptr. 347]), no interest whatsoever can be claimed by the usurious lender. (*Maze* v. *Sycamore Homes, Inc.,* 230 Cal.App.2d 746, 755 [41 Cal.Rptr. 338, 16 A.L.R.3d 464].)

The sole question remaining is the factual one whether Rochester has recovered the principal sum of $23,958.16[1] originally loaned to Litho. The record and the findings are not too clear. The trial court stated that $17,947.10 was still owing under two of the Rochester agreements when the petition for bankruptcy was filed in January 1965. The correctness of this figure is not questioned. Therefore, at the time of the auction sale it is clear that respondents had paid to Rochester under the agreements $16,175.50. The trial judge also stated that respondents had received $5,000 through the auction sale.

---

[1]This includes $1,230 advanced in 1963 for repair of two presses, over and above the $22,728.16 originally lent.

It is clear, however, that neither of these oral statements formed the basis of the trial court's judgment that appellant had fully received its principal and was ". . . entitled to take nothing."

The specific finding upon which the judgment rests is: "23. It is true that at the time that the plaintiff took possession of the said equipment and caused the same to be sold at auction that it was of a reasonable market value of $15,000.00."

Finding 23, especially since no counterfindings were proposed, must be read together with the undisputed evidence that respondents had paid to Rochester in excess of $16,000.

The quoted finding read together with the undisputed evidence in the record is ample support for the court's conclusion that appellant recovered its principal.  ■  It is settled that any ambiguity in findings must be construed in favor of the judgment. "Where necessary, reference may be made to the pleadings or record. (*Hersom v. Hersom* (1923) 60 C.A. 383, 385, 212 P. 717; *Kennedy etc. Co. v. S.S. Const. Co*. (1899) 123 C. 584, 586, 56 P. 964; *Brown v. Gow* (1933) 128 C.A. 671, 675, 18 P.2d 377.)  ■  And some uncertainties may be waived by failure to raise the objection in the trial court. (*Moore v. Craig* (1935) 5 C.A.2d 283, 286, 42 P.2d 647; *Sweet v. Hamilthoris* (1927) 84 C.A. 775, 782, 258 P. 652; *Goss v. Fanoe* (1952) 114 C.A.2d 819, 824, 251 P.2d 337 [objection on appeal that finding not sufficiently specific].)" (2 Witkin, Cal. Procedure (1954), p. 1842.)

The foregoing calculation assumes that the trial judge properly ignored the sales price received by appellant at the auction and substituted in lieu of the $5,000 actually received by appellant the reasonable value of the personal property, to wit: $15,000. Nothing in the Rochester agreements provided for the sale of the personalty leased thereby. Rochester merely reserved to itself the right in case of default to take possession of any and all the items comprised in the "lease" without demand or notice, without "any Court Order" or other process of law. Apart from the fact that in a secured transaction a stipulation of this kind is void by virtue of Civil Code, section 2889 (*Wakabayashi v. Stafford Packing Co.,* 186 Cal. 632, 633 [200 P. 392]), there was no attempt in the case at bench to conform to any statutory standards then in effect[2] which related by way of example, to the foreclosure of a mortgage (Civ. Code, § 2967) or the sale of a

---

[2]While the sale took place after the effective date of the Commercial Code (January 1, 1965), the transactions at bench were entered into before that date. Accordingly, the law which was in effect prior to January 1, 1965, governs the sale. (Com. Code, § 10102; *Phoenix v. Kovacevich,* 246 Cal.App.2d 774, 780, fn. 1 [55 Cal.Rptr. 135].)

pledge (Civ. Code, § 3002). In fact, the record discloses that Messrs. Kater and Lieberman received notice only four days before the sale and that certain attempts by Mr. Kater to come to an accommodation with Rochester were ignored by the latter.

The sale of a chattel subject to a security interest, which was conducted in the manner of the sale at bench, amounts to a conversion. (*Kee* v. *Becker,* 54 Cal.App.2d 466, 470-471 [129 P.2d 159].) We conclude that the trial judge properly substituted the reasonable value of the personal property involved for the price actually received as a result of the auction sale.

Appellant also contends that certain guarantee agreements signed by Mr. and Mrs. Kater and Mr. and Mrs. Lieberman, personally, of the Rochester agreements provide independent grounds for recovery and that the trial court was in error when it held that these guarantees did not apply.

The guarantors contend that the guarantees they severally executed were made as to a lease-back agreement, which, due to a technical flaw raised by Rochester, were never executed. Rochester contends that shortly afterwards, however, two new and separate lease-back agreements were executed as substitutes for the first two. It is admitted no new guarantees were signed by Mr. and Mrs. Kater or Mr. and Mrs. Lieberman. The trial court found specifically that it was *not* the intention of the parties that they should so apply. However, we need not, since the Rochester agreements were held to be usurious, decide the issue whether the said guarantees were intended to apply to the two new lease-back agreements. The principal obligation which Rochester contends was guaranteed was usurious. The sale thereunder was improper. In these circumstances, any guarantees, even if extant, are unenforceable. (Civ. Code, § 2810; *Wells* v. *Comstock,* 46 Cal.2d 528, 533 [297 P.2d 961].)

Since Rochester's claim for damages is unenforceable, it is unnecessary to deal with the contention that the named individual defendants were liable to Rochester under an *alter ego* theory for what was, in fact and law, a usurious rate of interest.

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.