[L.A. No. 30778. Apr. 24, 1978.]

FLORENTINE G. BOERNER et al., Plaintiffs and Appellants, v. COLWELL COMPANY, Defendant and Respondent.

38

**COUNSEL**

Patricia Herzog, Goldin & Goldin and Martha Goldin for Plaintiffs and Appellants.

Meserve, Mumper & Hughes, Cromwell Warner, Jr., L. Allan Songstad, Jr., Ellis J. Horvitz and Horvitz, Greines & Horowitz for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, George R. Richter, Jr., and Ronald M. Bayer as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**MANUEL, J.**—Plaintiff Florentine Boerner and eight other named plaintiffs commenced this class action against defendant The Colwell

Company (Colwell), alleging in substance that certain transactions involving its purchase of installment contracts for the construction of vacation homes constituted usurious loans to the purchasers of such homes (including plaintiffs) and seeking appropriate equitable and monetary relief. Pursuant to stipulation of the parties the cause was bifurcated for trial, the issue of defendant's liability to be tried first to the court sitting without a jury, and certain other issues, including those relating to the class action aspects of the matter, to be reserved for any necessary subsequent proceedings. The trial court, following trial of the liability issue, entered judgment for defendant Colwell, finding and concluding in essence that the contracts constituted bona fide credit sales from the building contractors to the purchasers followed by valid assignments to Colwell and that the transactions as a whole did not constitute loans subject to the usury laws. Plaintiffs appeal from the judgment.

I

The evidence, which is essentially uncontradicted, established the following: Colwell is a mortgage banking firm. Since 1961 it has had an installment contract department engaged in the purchase of installment contracts for the sale of mobile homes, vacation homes, and home improvements. Transactions in the latter two categories are handled in essentially the same fashion. When contacted by a builder interested in arranging for the purchase of its contracts,[1] and when satisfied with the builder's qualifications and general business reputation, Colwell and the builder sign an agreement detailing the conditions on which the builder's contracts will be accepted for purchase. Colwell then provides the builder with a series of forms—an individual set of which includes a credit application, a lien contract and deed of trust, and a truth-in-lending disclosure statement.[2] It also advises the builder of the finance charge rate to be included in a contract if it is to be accepted for assignment.

---

[1]Although in some instances Colwell initiated contact with a particular builder, in most cases it was the builder who, having learned of the service offered, sought out Colwell.

[2]The indicated forms were originally developed by Colwell in the belief that the transactions to which they were to be applied were credit sales governed by the Unruh Act (Civ. Code, § 1801 et seq.). In 1969, however—following the decision of this court in *Morgan* v. *Reasor Corp.* (1968) 69 Cal.2d 881 [73 Cal.Rptr. 398, 447 P.2d 638]—the act was amended to exempt contracts to construct a residential dwelling from its provisions (Civ. Code, § 1801.4). We shall address ourselves below to the matter of the meaning and significance of this amendment. (See fn. 12, *post.*) For the present it suffices to note

When a builder using the Colwell service enters into a vacation home construction contract with a landowner wishing financing, the forms provided by Colwell are filled out and executed by both parties to the contract.[3] These forms, along with the construction contract and the plans and specifications, are submitted to Colwell, which then undertakes a credit check, makes a "desk appraisal" of the value of the real property including the contemplated improvements, and orders a preliminary title report. If these investigations yield results acceptable to Colwell, it informs the builder and the landowner that it has accepted the contract for purchase and records the assigned lien contract and deed of trust. The price paid is the cash price reflected in the construction contract less a small charge for the builder's use of Colwell's "voucher system," a system developed by it to avoid mechanic's liens and disputes over payment.[4] The buyer, however, at this point becomes bound to pay Colwell the deferred purchase price (cash price plus finance charge), in monthly installments as reflected in the assigned lien contract—payment being secured by means of the assigned trust deed.

The evidence further showed that plaintiff Boerner and her husband (now deceased) contracted with FWF Construction Company for the construction of a vacation home on their property; that the eight other named plaintiffs (hereinafter the Wards) contracted with Nordic Mountain Homes for the construction of a vacation home on property which they owned jointly; that in each case the buyer desired financing and requested that the builder arrange it if possible; that in each case the builder arranged to have the construction financed by defendant Colwell

---

that Colwell has continued up to the present supplying the indicated forms to interested contractors.

[3] The parties to the lien contract and deed of trust are the landowner and the builder. The document states that the "buyer" (landowner) buys and the "seller" (builder) sells "goods and services" consisting of the construction of a described vacation home; it sets forth the cash price, the finance charge, and the deferred payment price (i.e., the sum of the cash price and the finance charge), and it specifies the number and amount of monthly installments. The trust deed portion of the document provides that the owner's real property shall serve as security for payment. On the reverse side is an assignment form, whereby the builder assigns its interest to Colwell, makes various warranties including "that there are no defenses" to the lien contract, and agrees to repurchase in the event of misrepresentation or breach of warranty.

[4] Under the "voucher system" the builder is issued a book of vouchers, and he in turn issues individual vouchers to suppliers and subcontractors for labor and material furnished. When Colwell is satisfied from its own inspection reports that the labor or materials covered by a particular voucher has been performed or delivered, it obtains mechanic's lien releases and disburses the money to the materialman or subcontractor. Apparently upon completion of the building the builder is paid the balance remaining in his "account."

in accordance with the procedure outlined above; and that in each case the annual percentage rate payable under the assigned lien contract and deed of trust was in excess of 10 percent.[5]

On the basis of these facts the trial court found and concluded that the transactions taking place between plaintiffs and their respective builders were bona fide credit sales and "not parts of loan transactions clothed in the form of credit sales"—and that the respective assignments of the builder's rights to Colwell were "an assignment of rights under a credit sale and were not loans by [Colwell] in the form of assignments." Accordingly, judgment on the complaint was entered for defendant Colwell. (See fn. 5, *ante.*)

II

The law of usury in this state is based upon the provisions of article XV, section 1 (formerly art. XX, § 22) of the state Constitution. That section provides: "The rate of interest upon the loan or forbearance of any money, goods or things in action, or on accounts after demand or judgment rendered in any court of the State, shall be 7 per cent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest not exceeding 10 per cent per annum. [¶] No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than 10 per cent per annum upon any loan or

[5]The cash price of the Ward home was $15,100. The finance charges under the lien contract and deed of trust amounted to $16,874.40—yielding a deferred payment price of $31,974.40, payable in 180 monthly installments of $177.08 each. The truth-in-lending statement stated that the finance charge represented an annual percentage rate of 11.6 percent.

The cash price of the Boerner home was $9,875. The finance charges under the lien contract and deed of trust amounted to $10,378.60—yielding a deferred payment price of $20,253.60, payable in 180 monthly installments of $112.52. The truth-in-lending statement indicated that the finance charge represented an annual percentage rate of 12.45 percent.

Following assignment of the Boerner lien contract and deed of trust to Colwell it was discovered that certain material misrepresentations had been made by the builder, FWF Construction Company, and a reassignment was made to the builder pursuant to the provisions of the assignment. (See fn. 3, *ante.*) Thus, Colwell did not hold the Boerner contract at the time of trial. It filed a cross-complaint against FWF Construction Company regarding this matter, and the judgment entered included an award in its favor and against FWF for $7,864.52, representing the stated cash price of the home less the sum paid by Boerner on the lien contract. FWF did not appeal, and this aspect of the judgment does not concern us here.

forbearance of any money, goods or things in action."[6] Sanctions and penalties to be applied in cases of violation are provided for by statute. (Deering's Ann. Uncod. Measures 1919-1, §§ 2, 3 (1973 ed.) pp. 40, 78, 10 West's Ann. Civ. Code (1954 ed.) foll. § 1916, p. 137 (1978 Cum. Supp.) p. 31; see *Heald* v. *Friis-Hansen* (1959) 52 Cal.2d 834, 838-839 [345 P.2d 457].)

 ██ Although the constitutional and statutory provisions dealing with usury speak only in terms of a "loan" or a "forbearance" of money or other things of value,[7] the courts, alert to the resourcefulness of some lenders in fashioning transactions designed to evade the usury law, have looked to the substance rather than the form of such transactions in assessing their effect and validity, and in many cases have struck down as usurious arrangements bearing little facial resemblance to what is normally thought of as a "loan" or a "forbearance" of money. (See, e.g., *Burr* v. *Capital Reserve Corp.* (1969) 71 Cal.2d 983 [80 Cal.Rptr. 345, 458 P.2d 185] (sale-leaseback); *Rochester Capital Leasing Corp.* v. *K & L Litho Corp.* (1970) 13 Cal.App.3d 697 [91 Cal.Rptr. 827] (sale-leaseback); *Golden State Lanes* v. *Fox* (1965) 232 Cal.App.2d 135 [42 Cal.Rptr. 568] (assignment of lease, sublease with agreement to repurchase)).[8] In all such cases the issue is whether or not the bargain of the parties, assessed in light of all the circumstances and with a view to substance rather than form, has as its true object the hire of money at an excessive rate of interest. (*Burr, supra,* at p. 989.) The existence of the requisite intent is always a question of fact. (*Id.*)

---

[6]Article XV, section 1 goes on to exempt from its restrictions certain types of institutional lenders, including (generally speaking) state-chartered banks, savings and loan associations, agricultural cooperatives, industrial loan companies, credit unions, and personal property brokers—most of which are regulated as to interest rates under provisions of the Financial Code. We take judicial notice of the case of Committee Against Unfair Interest Limitations v. State of California (Super. Ct. Los Angeles Co. No. C 158433), currently pending on appeal before the Court of Appeal for the Second District, in which the superior court, relying largely on the presence of these exemptions, has held that article XV, section 1 is unconstitutional and invalid in its entirety as in violation of the federal equal protection and commerce clauses. For purposes of the instant case we assume that article XV, section 1 of the state Constitution is valid.

[7]A "loan" of money is "the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use; . . ." (*Milana* v. *Credit Discount Co.* (1945) 27 Cal.2d 335, 339 [163 P.2d 869, 165 A.L.R. 621]; see also Civ. Code, § 1912.) A "forbearance" of money is the giving of further time for the repayment of an obligation or an agreement not to enforce a claim at its due date. (*Calimpco, Inc.* v. *Warden* (1950) 100 Cal.App.2d 429, 440 [224 P.2d 421].)

[8]A distinct category of cases, also the subject of careful scrutiny by the courts, includes those which, while involving facially valid "loans" or "forbearances," utilize the device

■ One area of great concern in this respect—to the commentators as well as to the courts—has been that of credit sales. It has long been the law in this jurisdiction, as well as in the vast majority of other jurisdictions, that a bona fide credit sale is not subject to the usury law because it does not involve a "loan" or "forbearance" of money or other things of value.

The leading case on the subject in this jurisdiction—*Verbeck* v. *Clymer* (1927) 202 Cal. 557 [261 P. 1017]—was an action in ejectment based upon an alleged default in payment under a contract for the sale of real property. The buyers in possession defended on the ground that the transaction represented by the contract was usurious, calling as it did for interest in excess of the legal rate on deferred payments, which were to extend over a 15-year period; they sought not only nullification of the interest provision in the contract but also treble damages. Declaring these claims "astonishing," we made haste to reject them: "[W]e have no hesitancy whatsoever in declaring that the transaction set up in the answer and cross-complaint is not in any sense a loan within the meaning of said usury law. The contract is admittedly a *bona fide* one of sale and purchase of real property where the title is retained by the vendor. The purchase price is therein named and the terms of sale are fixed and certain deferred payments are provided for. There is in the transaction no element of a loan. The parties were unfettered, dealt with each other at arm's-length and in apparent good faith. The transaction was not a subterfuge devised to conceal what was in fact a loan. . . . 'On principle and authority, the owner of property, whether real or personal, has a perfect right to name the price on which he is willing to sell, and to refuse to accede to any other. He may offer to sell at a designated price for cash or at a much higher price on credit, and a credit sale will not constitute usury however great the difference between the two prices, unless the buying and selling was a mere pretense; and it has been held that it is not material that the agreement for the purchase price in the future, instead of specifying the whole sum then to be paid, names a particular sum as principal, and declares that it shall draw interest at a

---

of collateral agreements which effectively result in the exaction of excessive interest. (See, e.g., *Thomas* v. *Hunt Mfg. Corp.* (1954) 42 Cal.2d 734 [269 P.2d 12] (borrower to pay for services never performed by lender); *Terry Trading Corp.* v. *Barsky* (1930) 210 Cal. 428 [292 P. 474] (borrower to buy materials at excessive price); *Haines* v. *Commercial Mortgage Co.* (1927) 200 Cal. 609 [254 P. 956, 255 P. 805, 53 A.L.R. 725] (borrower to pay for sham "expenses" of lender); *Mission Hills Dev. Corp.* v. *Western Small Business Inv. Co.* (1968) 260 Cal.App.2d 923 [67 Cal.Rptr. 505] (complex collateral option and repurchase agreement); *Knoll* v. *Schleussner* (1952) 112 Cal.App.2d 876 [247 P.2d 370] (borrower to perform "free" construction for lender).)

rate which, were the transaction a borrowing and lending, would clearly be usurious; . . .' " (*Id.,* at pp. 562-563.)

It is this principle which lies at the foundation of consumer and commercial credit sales practices in this country,[9] the massive finance industry which has grown up to service and facilitate those practices, and the body of statutory law which has been enacted to regulate the process for the common good. In California the basic laws in the consumer area, which among other things set limitations upon finance charges, are the Rees-Levering Act (Civ. Code, § 2981 et seq.), governing installment sales of motor vehicles, and the Unruh Act (Civ. Code, § 1801 et seq.), governing installment sales of other goods and services. These laws, it must be concluded, constitute a broad legislative approval of the credit-sale principle as an "exception" to the usury laws and a recognition that, whatever the rational weaknesses of the distinction on which it is based,[10] practical considerations of significant moment justify the regulation of credit sales by a means more flexible than that provided by the usury laws.[11]

[9]*California Loan and Finance Association,* in its brief *amicus curiae* filed in the court, offers the following figures (drawn from the 1976 Finance Facts Yearbook) as representative of the volume of credit sales presently carried on in this country: "As of year-end 1975, total consumer installment debt outstanding in the United States was 161.8 billion dollars. Of this amount, 53.6 billion dollars was on automobiles, 11.9 billion dollars was on mobile homes and 8.3 billion dollars was on home improvement transactions. The total included an unspecified amount for the purchase of other consumer goods and services. Additional billions of dollars were outstanding in business installment debt for the purchase of machinery, equipment and other goods." (Fn. omitted.)

[10]The following example, advanced by one of the leading commentators in the area, suggests some of the conceptual difficulties inherent in the distinction: "Take the case of a buyer who desires to purchase a $1,500 automobile but has only $500 in cash. If he borrows the $1,000 balance from a [nonexempt lender] for one year at a charge of $100, the usury statute applies. If, on the other hand, he buys the same automobile under a conditional sale contract, the time price will probably be quoted as $1,600 and the seller will discount the $1,100 balance of the contract to a sales finance company for $1,000, leaving the finance company a $100 profit on its advance. Under the cash-price-time-price dichotomy, the usury act would fail to protect the buyer in the second transaction, even though the credit-sale financing is similar, in several significant respects, to the direct-loan financing. In neither case does the seller finance the sale or the buyer have sufficient money to pay for the article immediately. In both cases, the advance of money is made by a financial institution, and in both the buyer pays a sum of money over and above the article's cash price for the privilege of deferring payment." (Warren, *Regulation of Finance Charges in Retail Instalment Sales* (1959) 68 Yale L.J. 839, 842.)

[11]"The distinction between finance charges and interest has been described by economists as of 'little economic significance.' Each is the cost of credit, and if consumers must be protected against excessive credit charges, finance charges are as deserving of regulation as interest rates. To the consumer, the distinction must seem pure legalese. To

We do not, however, understand plaintiffs to here mount a broadside attack upon the so-called time-price doctrine as an "exception" to the laws governing usury. Their position, as we perceive it, is simply that granting the nonapplicability of usury laws to bona fide credit sales, the transactions here in question—viewed from the standpoint of substance rather than form—must nevertheless be held to be usurious loans. We proceed to an examination of this contention.

### III

"A sale is the transfer of the property in a thing for a price in money. The transfer of the property in the thing sold for a price is the essence of the transaction . . . . A loan, on the other hand, is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use; and if such be the intent of the parties the transaction will be deemed a loan regardless of its form . . . ." (*Milana* v. *Credit Discount Co., supra,* 27 Cal.2d 335, 339.) By the same token, however, "[c]ontractors are free to buy and sell their property, and this may include promissory notes and other instruments, at a price agreed upon, and when the bona fides of the parties is established the percentage of profit has no relation to the usury law." (*Id.,* at p. 340.)

█ Plaintiffs, in their effort to demonstrate error in the trial court's finding that bona fide credit sales rather than usurious loans were here involved, direct our attention to a number of aspects of the subject transactions which in their view compel a contrary determination. Thus they urge that here there was no "transfer of . . . property . . . for a price" because at the time of the subject transaction the "property" in question (i.e., a completed vacation home) was not in existence. It is clear, however, that contracts of the type here in question—calling for the provision of materials and labor in the construction of specified improvements to real property—result in a transfer of "property" within the meaning of the credit-sale doctrine. █ (*Lamb* v.

---

subject sales-finance companies to the usury acts, however, might constitute a death blow to this vital enterprise. Instalment credit is so expensive to service that a finance company often cannot operate profitably within the limitations of most usury acts. Manifestly, the vast product of American industry cannot be marketed without instalment selling; hence, instalment-finance institutions must be kept healthy. The basic problem is therefore to strike a fair balance between protecting consumers against excessive finance charges and maintaining conditions in the instalment-finance business which will encourage financial institutions to meet the credit needs of an ever-growing economy." (Warren, *Regulation of Finance Charges in Retail Instalment Sales, supra,* 68 Yale L.J. 839, 850; fns. omitted.)

*Herndon* (1929) 97 Cal.App. 193, 200 [275 P. 503]; see also Civ. Code, §§ 1802.1, 1802.2; *Morgan* v. *Reasor Corp., supra,* 69 Cal.2d 881, 887-889.[12]) ■ Equally without significance is the fact that one of the documents executed by the parties, namely the construction contract, failed to establish and set forth separately stated cash and credit prices; our consideration of the parties' transactions from the standpoint of substance rather than form requires that we consider together all of the documents which they executed to memorialize them, and both the lien contract/deed of trust and the truth-in-lending disclosure statement clearly indicate both the cash and credit prices. ■ Similarly, the fact that the parties, in several of the documents generated by the transactions—notably the credit applications and various letters written by Colwell—referred to them as "loans" is not a matter to be viewed as dispositive if, in light of all of the other circumstances, it appears that the substance of the bargain was otherwise. (See *King* v. *Central Bank* (1977) 18 Cal.3d 840, 847 [135 Cal.Rptr. 771, 558 P.2d 857].) ■ By the same token the statement of finance rates and charges in terms of a percentage of cash price is not necessarily indicative of a "loan" at "interest." (See *Verbeck* v. *Clymer, supra,* 202 Cal. 557.)

---

[12]*Morgan* was an action for declaratory relief to determine whether the provisions of the Unruh Act applied to factual circumstances similar in all relevant respects (excepting one to be discussed at a later point in this opinion) to those here before us. Viewing the transaction as of the date of the execution of the contract, and concluding that the materials and labor to be provided thereunder were "goods" and "services" within the meaning of Civil Code sections 1802.1 and 1802.2 respectively, we held that the provisions of the act applied. In so doing, of course, we also held by implication that such a transaction (i.e., the transaction involved in *Morgan*) amounted to a credit "sale" rather than a "loan" subject to the usury laws; our result in this respect was wholly consistent with the case of *Lamb* v. *Herndon,* cited in the text. In 1969, however, at the session next following our decision, the Legislature amended the act by adding section 1801.4, which provided in relevant part that the act should not apply to a contract "providing for the construction, sale, or construction and sale of an entire residence . . . with or without a parcel of real property or an interest therein, or for the sale of a lot or parcel of real property . . . ." Section 2 of the enacting legislation (Stats. 1969, ch. 554, p. 1180) provided: "This act is intended to abrogate any contrary rule in Morgan v. Reasor Corp. . . ."

It is clear from the subject legislation that the lawmakers intended thereby to remove transactions of the type here in question from the controls of the Unruh Act. It is somewhat less clear whether they also intended to abrogate any indication in *Morgan* that such transactions were to be deemed secured by personal rather than real property; while this point may be of considerable significance in circumstances involving default by the buyer (see Hetland, Cal. Real Estate Secured Transactions (Cont.Ed.Bar 1970) § 6.43, pp. 301-305; *Prunty* v. *Bank of America* (1974) 37 Cal.App.3d 430 [112 Cal.Rptr. 370]; Hetland, Secured Real Estate Transactions (Cont.Ed.Bar 1974) §§ 9.27, 9.34, pp. 218, 221; Note, *Prunty v. Bank of America: An Expanding Concept of "Purchase Money"* (1975) 12 Cal.Western L.Rev. 142), it is of no relevance to the instant inquiry because a bona fide credit sale may involve either real (see *Verbeck* v. *Clymer, supra,* 202 Cal. 557), or personal property. To assert, as plaintiffs essentially do, that the legislative

██ Plaintiffs also rely on the consideration that they were required to put up their own real property as security; this, they urge, is further indicative that the transactions in question were loans, not sales. It is clear, however, that the taking of a security interest in real property owned by the buyer is not inconsistent with a bona fide credit sale—at least in a case where the property which is the subject of the sale is to be affixed and made a part of the real property given as security for payment. (See *Lamb* v. *Herndon, supra,* 97 Cal.App. 193; *Morgan* v. *Reasor Corp., supra,* 69 Cal.2d 881, discussed at fn. 12, *ante*; *Mills* v. *Herrod* (1974) 37 Cal.App.3d 213 [112 Cal.Rptr. 397].[13]) Indeed, the Unruh Act explicitly provides for such security (Civ. Code, §§ 1803.2, 1804.3;[14] 45 Ops.Cal.Atty.Gen. 8 (1965); 40 Ops.Cal.Atty.Gen. 232

---

overruling of *Morgan* to the extent it states a rule "contrary" to Civil Code section 1801.4 manifests an intention on the part of the Legislature to treat all transactions of the type described in the statute as "loans" subject to the usury laws—regardless of the substance of the transaction when assessed in light of the traditional loan/credit-sale distinction—is clearly to read far too much into the amendment.

It is true that our observations on this point necessarily lead to the conclusion that a bona fide credit sale transaction of the type described in section 1801.4 is under present law subject to finance charge or interest regulation under neither the Unruh Act nor the usury laws. In this respect, however, the law stands exactly as it did prior to our *Morgan* decision. If the Legislature wishes to impose such regulation in this area it is of course free to do so.

[13]In *Mills* v. *Herrod, supra,* plaintiff sold an existing house to defendants and agreed to move it onto their real property. Defendants made no down payment but gave plaintiff a promissory note for $10,000, payable in 90 days with interest, and a trust deed on the real property as security. In a subsequent action to foreclose the trust deed defendants claimed that the contract and security arrangements were in violation of a provision of the Unruh Act precluding contracts for other than services from providing for "a lien on any goods theretofore fully paid for or which have not been sold by the seller." (Civ. Code, § 1804.3, subd. (a).) The Court of Appeal disagreed. Noting that liens of this character had been permitted in similar circumstances by the common law and that our *Morgan* decision had impliedly rejected the construction urged, the court stated: "In our view the deed of trust given here did not violate Civil Code section 1804.3 quoted above. To the extent it created a lien on the house which was moved onto the property it was upon goods which had not been paid for; to the extent it attached to the real property it was not a lien on goods and was not prohibited by the language of the section itself. Even as it read before the 1969 amendment [to section 1804.3, precluding liens on real property where goods sold are not to be attached thereto; see footnote 14, *post*], we find nothing in the section or in any other provision of the Unruh Act which would invalidate the deed of trust as to the principal obligation in the amount of $10,000." (37 Cal.App.3d at p. 217.)

[14]Section 1803.2 of the Civil Code provides for a specific form of lettering at the top of the lien contract when ". . . a lien on other goods *or realty* is obtained by the seller as security for the goods or services purchased." Section 1804.3, subdivision (b), which was added in 1970, imposes a limitation in the case of contracts for the sale of *goods* by indicating that any such contract "which provides for a lien on real property where the goods sold are not to be attached to the real property" shall be in violation of the act and subject to penalties.

██

(1962)), and no reason has been suggested why credit sale transactions not subject to that act should be restricted to any greater extent in this respect. Here, as indicated above, the property which was the subject of the transaction—whether it be considered the completed vacation home or the materials and labor necessary to bring it into existence—was intended to be and was in fact affixed to and made a part of the real property to be given as security. In these circumstances it was both logical and proper for the parties to fashion their security arrangements as they did.

■■■ We are thus brought to what we deem to be the most troublesome aspect of the subject transactions from the point of view of assessing their true substance: the role of the third-party financing institution. If it be granted—as we think it must—that these transactions would be regarded as bona fide credit sales had there been no assignment of the contracts from the respective builders to Colwell, must this characterization be altered in light of the assignments and the circumstances out of which they arose?

■■■ We think it clear from our *Morgan* decision that the fact of assignment *in and of itself* has no significant effect on the characterization of the transaction according to its substance, for that case like this one involved the assignment of a credit sale contract for the construction of a residence from the builder to a financing institution. ■■■ There, however, our opinion reflects no significant involvement of the financing institution in the development and consummation of the bargain between the buyer and the builder, and the only indication relating to temporal sequence is our observation that the assignment occurred "[w]ithin three months thereafter...." (69 Cal.2d at p. 886.) Here, on the other hand, the financing institution occupied a central position in shaping the transactions from the outset. The buyers having determined that they would go forward with the contemplated construction of their vacation homes only if financing could be obtained, the builders set in motion a procedure whereby, in accordance with prior arrangements made by them with Colwell, the feasibility of financing *by Colwell* could be determined. Under this procedure the parties were supplied with forms developed and supplied *by Colwell* which essentially set forth the terms under which *Colwell,* through the device of contemporaneous assignment at a prearranged discount, would agree to finance the contemplated purchase and sale. Included among these terms was the finance charge to be paid by the buyers. *Colwell,* not the builders, passed upon the question of the buyer's credit reliability, and only when *it*

determined that such credit reliability was acceptable *to it* did it agree to participate in the transactions as the financing agent.

Plaintiffs, urging that this kind of participation by the financing institution rendered it a "lender" of money within the meaning of the usury laws, relies heavily on our decision in *Glaire* v. *La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915 [117 Cal.Rptr. 541, 528 P.2d 357]. There membership in a certain health club was sold at a set price, payable either in cash at the outset or in monthly installments for two years under a form contract declaring that no "service charge" was made for the extension of credit. Understandably, most members chose the "no service charge" credit arrangement and executed the contract. The contracts were then sold "as a matter of course" and at a 37.5 percent discount to a financing institution; the latter and the health club were "interlocking corporations with common ownership and control." (12 Cal.3d at p. 918.) ▪ After holding that the discount constituted a "buried finance charge" subject to the federal truth-in-lending laws,[15] we addressed plaintiffs' additional contention that the trial court had erred in sustaining defendant's general demurrer to a cause of action alleging usury. Upholding this contention, we pointed out that the credit sale "exception," to the usury laws (upon which the trial court had apparently relied) is applicable only " 'when the bona fides of the parties is established. . . .' " (12 Cal.3d at p. 927, quoting from *Milana* v. *Credit Discount Co., supra,* 27 Cal.2d 335, 340.) Concluding that this was a question of fact raised by the allegations of the complaint, we returned the matter to the trial court for further proceedings. "By sustaining the demurrer," we stated, "the trial court precluded plaintiff from offering evidence to establish that defendants' practice of discounting notes in fact operated to conceal the imposition of usurious interest charges, and in so doing the court clearly erred. As we have often noted, substance not form must dictate the treatment that a transaction is to be accorded under the usury law, and the question of substance is predominantly a factual inquiry." (12 Cal.3d at p. 927.)

---

[15]In the course of our discussion of this matter we rejected the defendant financing institution's argument that it, as the mere assignee of the contracts had no truth-in-lending responsibilities: "Where, as appears here, a finance company assumes so close a relationship with a seller that it becomes an integral part of the seller's financing program, the financing company must bear full responsibility for all disclosures required under Truth-in-Lending. Thus, there comes a point at which, because of its continual dealings with a particular seller, a finance company may be viewed directly as the extender of consumer credit which the seller has merely arranged. (15 U.S.C. § 1602(f); 12 C.F.R. § 226.2(f).)" (12 Cal.3d at p. 925.)

 We think it manifest that there are critical distinctions between the *Glaire* case and that now before us. Foremost among them, of course, is the fact that here the question of good faith has been examined by the trial court in light of the evidence before it at trial and has been resolved in Colwell's favor; the question before us is whether that determination should be sustained as supported by the evidence. Clearly this case does not involve the question of a "buried finance charge" in the shape of an undisclosed discount flowing from the buyer to the financing institution; here the finance charges were at all times clearly stated, and the "discount" was simply the difference between the stated cash price and the stated deferred payment price. We find no indication in the record before us that the parties' dealings were other than in good faith, as the trial court found them to be. The question before us, therefore, resolves itself to this: Does the mere participation by a nonexempt financing institution in a transaction such as that before us—no matter how well-intentioned and no matter how fully disclosed to the contracting parties—operate to convert what would otherwise be regarded as a bona fide credit sale (such as, for example, in the case where the builder is able to finance the sale itself without institutional assistance) into a "loan" subject to the usury laws?

Under the law of this and the significant majority of other[16] jurisdictions the answer is clearly no. Representative of the California position is the case of *Ricker* v. *Fay* (1931) 110 Cal.App. 750 [294 P. 732]. There the plaintiff in an action for usury had entered into an installment contract for the purchase of an automobile from a dealer who had subsequently sold the contract, as was its custom, to the defendant financing institution for an amount equal to the retail cash price of the automobile. The evidence established that the plaintiff had been informed at the time of the contract that if the automobile were purchased on a time basis a given "mark up" would be added for the cost of financing according to the length of the desired time contract, and that the resultant deferred payment price " 'would be the price we [i.e., the dealer] would have to charge in order to have the Fay Securities Company- take the contract on a time sales price.' " (*Id.,* at p. 752.) Rejecting the finding of the trial court that the total transaction including the assignment constituted a "loan" in violation of the usury laws, the Court of Appeal reversed. "It has repeatedly been held that where the time sale price exceeds the cash sales price and the difference amounts to more than the legal rate of interest it does not follow that the transaction is usurious, but that other considerations than interest are properly

---

[16]See generally Annotation (1967) 14 A.L.R.3d 1065, 1091-1112.

involved, such as the risk incident to financing the contract, expenses connected therewith, etc. [citing *Verbeck* v. *Clymer, supra,* 202 Cal. 557, and other cases]." (*Id.,* at p. 753; see also *Klett* v. *Security Acceptance Co.* (1952) 38 Cal.2d 770 [242 P.2d 873]; *Pacific Finance Corp.* v. *Lauman* (1928) 95 Cal.App. 541 [273 P. 48].)

We conclude that the participation by Colwell in the shaping of the contracting parties' bargain—in the manner and mode revealed by this record—does not operate to convert the resulting transactions, including the contemplated assignment, into usurious loans. While the relative "closeness" of the relationship between the seller and the financing institution may have a significant effect on whether the latter's rights are to be considered subject to the defenses and claims of the purchasers (see *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 822 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Morgan* v. *Reasor Corp., supra,* 69 Cal.2d 881, 894; *Coml. Credit Corp.* v. *Orange Co. Mach. Works* (1950) 34 Cal.2d 766, 771 [214 P.2d 819]; see also fn. 3, *ante*), we hold that it is without significance in itself in the determination whether the subject transactions, considered from the point of view of substance rather than form, are to be characterized as usurious loans rather than bona fide credit sales.[17]

The role of the financing institution in transactions of this kind is basically a beneficial one, for the essence of their function is that of providing needed financial assistance to sellers unable to handle their own consumer financing, thus permitting those sellers to compete on a more equal footing with their more established competitors. While regulation of these activities is essential for the protection of the vital interests of the consumer, the Unruh and Rees-Levering Acts provide ample evidence of the Legislature's willingness to provide such regula-

---

[17]Our view of the matter finds eloquent support in the words of Dean Warren: "Why the convenient arrangement typically existing between dealer and finance company, under which the latter furnishes contract forms, rate charts, and other services, should make credit sales any more potentially usurious than a random or casual relationship is difficult to perceive. Whether, during a given month, a dealer sells one hundred retail contracts to one finance company or one contract to each of a hundred different companies seems to have little bearing on whether a credit buyer is being charged usurious interest. If this be true, of what consequence is the closeness of his relationship to the financing agency? The reason finance companies furnish rate charts is obvious, and certainly their motive in supplying dealers with printed forms is legitimate. Since the finance agency must be sure of its rights under the retail contracts and notes purchased, the most convenient procedure is for the agency to supply retailers with a form prepared by its own attorneys." (Warren, *Regulation of Finance Charges in Retail Installment Sales, supra,* 68 Yale L.J. 839, 847; fn. omitted.)

tion; we must assume that the lawmakers, in light of the instant opinion, will make haste to treat the narrow, perhaps inadvertently unregulated area with which this case is concerned. (See fn. 12, *ante.*) In any event, it is our view that the instrument of the usury laws has no place in the field of bona fide credit sale financing, and that its use must be limited to those cases in which the record clearly reveals that the substantial intent of the parties was to effect the hire of money at an excessive rate of interest rather than to finance a bona fide sale of property. This is not such a case.

The judgment is affirmed.

Tobriner, J., Clark, J., and Richardson, J., concurred.

**MOSK, J.**—I dissent.

The people of California have made it emphatically clear that they reject exaction of usurious rates of interest as an acceptable commercial practice. They first adopted an initiative measure by popular vote in 1918 (Deering's Ann. Uncod. Measures 1919-1 (1973 ed.) p. 35; 10 West's Ann. Civ. Code (1954 ed.) foll. § 1916 at p. 123) and in 1934 felt deeply enough committed on the subject to write the prohibition against usury into the state Constitution. (Former Cal. Const., art. XX, § 22.) In 1976 the electorate twice rejected efforts to raise interest rates (Prop. 12, June 8, 1976; Prop. 5, Nov. 2, 1976) and reenacted the constitutional usury provision as present article XV (Prop. 14, June 8, 1976).

In response to this unmistakable legislative intent of the people, courts have been alert to pierce the veil of any plan designed to evade the Usury Law. (*Milana* v. *Credit Discount Co.* (1945) 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621].) As we have often noted, substance not form must dictate the treatment that a transaction is to be accorded under the Usury Law. (*Glaire* v. *La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 927 [117 Cal.Rptr. 541, 528 P.2d 357].) A conscious attempt to evade the Usury Law is not necessary; usury may be found where there has been nothing more than knowing receipt of sums above the legal rate of interest. (*Burr* v. *Capital Reserve Corp.* (1969) 71 Cal.2d 983, 989 [80 Cal.Rptr. 345, 458 P.2d 185].)

Pursuant to the foregoing general rules, the Court of Appeal reviewed the evidence and held the instant transaction, despite its subtle form, to be a usurious loan. Since I agree with that court's conclusion, I adopt as my dissent the opinion of Justice Dunn, concurred in by Justices Kingsley and Jefferson. The opinion, excepting only its additional discussion of constitutionality, follows:

Florentine Boerner and other named plaintiffs[1] commenced a class action in usury against The Colwell Company. The second amended complaint alleged that the class represented by plaintiffs consisted of all persons who were obligated to defendant in purported credit sales which were, in fact, loans providing for the payment of interest at rates in violation of the Usury Law. Pursuant to stipulation of the parties the cause was bifurcated, and liability to be tried first. Trial of the liability issues was by the court, without a jury. Judgment was entered in favor of defendant, and against plaintiffs. Plaintiffs appeal from the judgment.

The evidence, all of which was uncontradicted, showed: defendant, The Colwell Company, is a mortgage banking firm; it has an installment contract department, which was formed in 1961 for the purpose of purchasing contracts for the construction of home improvements and vacation homes; defendant's legal counsel concluded that such transactions involved the purchase of contracts created through credit sales, and therefore were governed by the Unruh Act (Civ. Code, § 1801 et seq.); accordingly, defendant developed forms for use in the purchase of such contracts in an effort to comply with the requirements of the Unruh Act; such forms included a credit application, a lien contract and deed of trust, and a credit sale disclosure statement; although defendant in some cases actively sought contracts to purchase, most of its business was generated by builders contacting defendant and asking if it were interested in purchasing their contracts; if defendant were satisfied regarding a builder's qualifications, it supplied him with the forms enumerated above; defendant also indicated to the builder the rate of the finance charge to be inserted in the lien contract in order to make it acceptable for purchase by defendant; after a builder entered into a contract for the construction of a vacation home for a landowner, the builder submitted to defendant the construction contract, the plans and specifications for the home, the owner's credit application, the lien contract and deed of trust, and the disclosure statement; the application,

---

[1] In addition to Boerner, the named plaintiffs were: James Ward, Lora Lee Ward, Perry Babcock, Clara Babcock, James Brewster, Marilynn Brewster, Robert Hench and Ann Hench.

the contracts and the statement were executed by builder and owner before being submitted to defendant; defendant investigated the owner's credit, made a "desk appraisal" of the value of his real property, and ordered a preliminary title report on the property; if these factors were acceptable, defendant informed the owner that his construction loan had been approved; defendant then purchased the contract from the builder, paying him the cash price of the construction less a charge for defendant's payment of labor and material through its voucher system; under this system, defendant issued a "voucher book" to the builder who, in turn, issued individual vouchers to suppliers and subcontractors for labor and material furnished; the vouchers were submitted to defendant for payment, and were paid after defendant was satisfied that the labor and material in question had been furnished; defendant also recorded the lien contract and deed of trust; this document stated that the "buyer" (owner) purchased from the "seller" (builder) "goods and services" consisting of the construction of a described vacation home; it set forth the cash price, the finance charge and the deferred price (i.e., the sum of the cash price and the finance charge), and specified the number of monthly installments and the amount of each installment necessary for payment of the deferred price; another portion of the document was in the form of a trust deed, with the owner's land serving as security for his payment of the deferred price; the reverse side of the document contained an assignment of the lien contract and trust deed by the builder to defendant.

The evidence also showed: FWF Construction Company agreed to construct a vacation home for plaintiff Boerner and her husband on their real property; Nordic Mountain Homes agreed to construct a vacation home for the other named plaintiffs (hereinafter referred to as the Wards) on real property which they jointly owned; the plaintiffs were told by the respective builders that construction of the homes was contingent upon the obtaining of financing; in each case the builder arranged to have the construction financed by defendant in accordance with the procedure described above; the cash price of the Boerner home was $9,875; the lien contract and deed of trust executed by the Boerners fixed the finance charge at $10,378.60, for a deferred price of $20,253.60, payable in 180 monthly installments of $112.52 each; the credit sale disclosure statement stated that the annual percentage rate of the finance charge was 12.45 percent; the cash price of the Ward home was $15,100; the lien contract and deed of trust executed by the Wards fixed the finance charge at $16,874.40, for a deferred price of $31,974.40, payable in 180 monthly installments of $177.08 each; according to the credit

disclosure statement furnished to the Wards, the finance charge represented an annual percentage rate of 11.6 percent; plaintiffs' respective lien contracts were assigned to defendant and were recorded; thereafter, and pursuant to such contracts, plaintiff Boerner paid defendant $2,010.48;[2] plaintiffs Ward paid $9,916.48.

The trial court found, as facts: a bona fide sale transaction occurred between plaintiffs and their respective builders; the contracts between plaintiffs and the builders were credit sales and not parts of loan transactions clothed in the form of credit sales; the respective assignments of the builders' rights to defendant were assignments of rights under credit sales, and were not loans by defendant to plaintiffs in the form of assignments.

The basic Usury Law is set forth in article XX, section 22 (now art. XV, § 1, ¶ 2), of the California Constitution: "No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than 10 per cent per annum upon any loan or forbearance of any money, goods or things in action." To constitute usury there must be a borrowing and lending or forbearance of money. (1 Witkin, Summary of Cal. Law (8th ed.) Contracts, § 388, p. 324.) Hence, where a seller offers property at a designated price for cash or at a much greater price on credit, the credit sale will not constitute usury, however great the difference between the cash price and the credit price. (*Wilson* v. *J. E. French Co.* (1931) 214 Cal. 188, 189 [4 P.2d 537]; *Verbeck* v. *Clymer* (1927) 202 Cal. 557, 563-564 [261 P. 1017]; *Lamb* v. *Herndon* (1929) 97 Cal.App. 193, 200 [275 P. 503].) Whether a particular transaction is a sale or a usurious loan is a question of fact; and the trier of fact, in making such determination, must look to the substance of the transaction rather than to its form, and consider all the circumstances surrounding the transaction. (*West Pico Furniture Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 603 [86 Cal.Rptr. 793, 469 P.2d 665]; *Burr* v. *Capital Reserve Corp.* (1969) 71 Cal.2d 983, 989 [80 Cal.Rptr. 345, 458 P.2d 185]; *Thomas* v. *Hunt Mfg.*

---

[2]After the FWF Construction Company assigned to defendant the Boerner lien contract and deed of trust, defendant discovered that the cash price designated in the contract included a sum of money to be used for a purpose other than construction of the home. Defendant therefore reassigned the Boerner contract to FWF, and did not hold such contract at the time of trial.

Defendant filed a cross-complaint against FWF to recover $7,864.52, representing the cash price of the home less the sum paid by Boerner on the contract. Judgment for this sum was entered in favor of defendant and against FWF on the cross-complaint. No appeal was taken from that judgment.

*Corp.* (1954) 42 Cal.2d 734, 740 [269 P.2d 12]; *Baruch Inv. Co.* v. *Huntoon* (1967) 257 Cal.App.2d 485, 492 [65 Cal.Rptr. 131].) As pointed out in *Milana* v. *Credit Discount Co.* (1945) 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621]: "The courts have been alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance." Where the form of the transaction makes it appear to be nonusurious, it is for the trier of fact to determine whether the intent of the contracting parties was that disclosed by the form adopted, or whether such form was a mere subterfuge to conceal a usurious transaction. (*Forte* v. *Nolfi* (1972) 25 Cal.App.3d 656, 678 [102 Cal.Rptr. 455]; *Janisse* v. *Winston Investment Co.* (1957) 154 Cal.App.2d 580, 582 [317 P.2d 48, 67 A.L.R.2d 225].) Thus, intent is material in determining the nature of the transaction; but once the true nature is shown, the intent with which the act was performed is immaterial. (*Wood* v. *Angeles Mesa Land Co.* (1932) 120 Cal.App. 313, 324 [7 P.2d 748].) In other words, a conscious attempt to evade the Usury Law is not necessary. (*Burr* v. *Capital Reserve Corp., supra,* 71 Cal.2d at p. 989.)

The distinction between a sale and a loan is defined as follows in *Milana* v. *Credit Discount Co., supra,* 27 Cal.2d at pages 339-340: "A sale is the transfer of the property in a thing for a price in money. The transfer of the property in the thing sold for a price is the essence of the transaction. The transfer is that of the general or absolute interest in property as distinguished from a special property interest. A loan, on the other hand, is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use; and if such be the intent of the parties the transaction will be deemed a loan regardless of its form. . . . [¶] In a sale the delivery of the absolute property in a thing and the receipt of a price therefor consummate the transaction. In a loan the initial transaction creates a debit and credit relationship which is not terminated until replacement of the sum borrowed with agreed interest."

All of the facts in this case indicate that the transactions were loans, not credit sales. Thus: the builders informed plaintiffs that construction of the vacation homes was contingent upon plaintiffs' obtaining financing; the builders did not offer to finance the construction, or to extend credit to plaintiffs; they agreed to build the homes only if plaintiffs could provide the necessary funds; to this end, the builders put plaintiffs in contact with defendant; plaintiffs applied for credit to defendant, not to the builders, and it was defendant who passed upon plaintiffs' credit and determined whether or not to finance the construction on their behalf;

defendant supplied the builders with the forms to be used in entering into credit sales of materials and labor to plaintiffs;[3] defendant dictated the finance charge which the builders must levy if defendant were to purchase the contracts; defendant had no property or services to sell; its sole function was to furnish the money, without which the builders would not commence the construction called for by the contracts; upon assignment of the contracts to defendant, the builders looked to defendant for payment of the cost of construction; by the assignment, plaintiffs became bound to pay defendant the cash price of the construction, plus the finance charge.

These facts indicate that, as between plaintiffs and defendant, the transactions, in substance, created an obligation on defendant's part to pay the cash price to the builders on plaintiffs' behalf, and an obligation on plaintiffs' part to pay an equivalent sum to defendant, plus the finance charge. Therefore, the transactions were loans. A similar conclusion was reached in *National Bank of Commerce of Seattle* v. *Thomsen* (1972) 80 Wn.2d 406 [495 P.2d 332], wherein the court stated (at p. 338): "It is correct that one who sells goods or services on credit is not a lender of money. But a third party who pays the seller on behalf of the purchaser is, insofar as his relations with the purchaser are concerned, a lender of money. In a case such as this, where the purchase is financed from the beginning, there is never a true *conditional* sale. The sale is complete as far as the vendor is concerned. He does not extend credit to the purchaser; rather, he is paid in full at the time of purchase. The 'conditional sale contract' is then but a security device to protect the party who finances the purchase." (Italics in original.) (See also *Hare* v. *General Contract Purchase Corp.* (1952) 220 Ark. 601 [249 S.W.2d 973, 977-978]; Annot. (1967) 14 A.L.R.3d pp. 1151-1153, § 21.)

It is true that where a finding of either a loan or a sale can be inferred from the facts, an appellate court may not substitute its judgment for that of the trial court. (*West Pico Furniture Co.* v. *Pacific Finance Loans, supra,* 2 Cal.3d at p. 604; *Baruch Inv. Co.* v. *Huntoon, supra,* 257 Cal.App.2d at p. 492.) However, the evidence in this case is subject to only one reasonable inference, viz.: the transactions in question were

---

[3]Defendant originally developed the forms used in this case in the belief that contracts for the construction of vacation homes on a credit basis constituted credit sales governed by the Unruh Act (Civ. Code, § 1801 et seq.). However, in 1969 the Legislature enacted Civil Code section 1801.4, which provides that a contract to construct a residential dwelling is not within the act. (Stats. 1969, ch. 554, § 1.) Since the transactions in this case occurred in 1971, defendant could not reasonably have believed they constituted credit sales governed by the Unruh Act.

loans, not credit sales. It follows that the "finance charge" is interest. Since that interest in each of transactions exceeds 10 percent per annum, it is usurious.

For the reasons stated in the foregoing opinion of the Court of Appeal, I would reverse the judgment.

Bird, C. J., and Newman, J., concurred.

Appellants' petition for a rehearing was denied May 24, 1978. Mosk, J., was of the opinion that the petition should be granted.