[No. D012685. Fourth Dist., Div. One. Mar. 6, 1991.]

DCM PARTNERS, Plaintiff and Respondent, v.
CHERRILL ANN SMITH, Defendant and Appellant.

COUNSEL

Mitchell, Keeney, Barry & Pike and E. Ludlow Keeney, Jr., for Defendant and Appellant.

Miller, Ewald & Monson, Thomas M. Monson and Patricia M. Bailey for Plaintiff and Respondent.

OPINION

WIENER, Acting P. J.—In a municipal court nonjury trial plaintiff DCM Partners (DCM) was awarded $11,912.50 representing the usurious interest

paid to defendant Cherrill Ann Smith on a secured promissory note. After the appellate department of the superior court affirmed the judgment, the case was certified to this court under California Rules of Court, rule 63 so that we might decide whether the usury law applies to a modified purchase money secured note initially created in an exempt transaction, the bona fide sale and purchase of real property, where the modification, done at the request of the trustor, consisted solely of increasing the rate of interest to reflect market conditions in consideration of extending the due date of the note. We hold that in these circumstances the usury law does not apply and accordingly reverse the judgment with instructions to the superior court to enter judgment for Smith.

FACTUAL AND PROCEDURAL BACKGROUND

The following undisputed facts are taken from the parties' agreed statement on appeal.

On July 30, 1979, DCM bought improved real property on Front Street in El Cajon from Smith and her former husband. DCM paid $160,000 for the property: $52,000 cash with the balance in the form of a secured promissory note on the property bearing interest at 10 percent per annum. The note provided for monthly installments of interest only with the entire unpaid principal balance and accrued interest due on September 27, 1984.

In August 1984 DCM determined it could not pay the note when due and its representative asked Mr. Smith to extend the maturity date. When the request was made the Smiths knew they could invest the principal balance at an interest rate substantially greater than 10 percent. They therefore agreed to extend the note provided the annual interest was increased to 15 percent. Neither party was aware of the applicable usury laws and the Smiths had no intention of taking more money from DCM than that to which they were legally entitled. Pursuant to the parties' agreement Smith's counsel prepared a modification agreement increasing the interest rate and assigning Mr. Smith's interest in the note to his wife.

DCM made all payments in a timely manner and paid the note in full on its due date. After Smith reconveyed the deed of trust, DCM filed this action seeking to be reimbursed the 15 percent interest it paid as being usurious, plus attorney's fees. The trial court and later the appellate department agreed with DCM ultimately resulting in the legal issue noted above being presented to us for our review.

DISCUSSION

I

California Constitution, article XV, section 1 limits the interest rate for a "loan or forbearance" of money not primarily for personal, family or household purposes, to the higher of: (1) 10 percent per annum or (2) 5 percent plus the rate of interest prevailing on the 25th day of the month preceding the earlier of the date of the extension of the contract to make the loan or forbearance or the date of making the loan or forbearance, established by the Federal Reserve Bank of San Francisco on advances to member banks under sections 13 and 13(1) of the Federal Reserve Act. (12 U.S.C. § 221 et seq.)

Here, the rate prevailing on August 25, 1984, was 9 percent thereby making usurious anything in excess of 14 percent as of the date of the modification agreement. The 15 percent interest rate here is therefore usurious unless the modified secured note is exempt from the usury laws.

II

Whether a loan or forbearance of money is usurious depends on the nature of the transaction. Sensitive to the ingenuity and creativity of those entrepreneurs willing to engage in legal brinkmanship to maximize profits, courts have carefully scrutinized the form of seemingly innocuous commercial transactions to determine whether the substance amounts to a usurious arrangement. (*Southwest Concrete Products* v. *Gosh Construction Corp.* (1990) 51 Cal.3d 701, 705 [274 Cal.Rptr. 404, 798 P.2d 1247].) In doing so courts have distinguished between a "loan" or "forbearance" of money and a bona fide credit sale (*Boerner* v. *Colwell Co.* (1978) 21 Cal.3d 37, 43-51 [145 Cal.Rptr. 380, 577 P.2d 200]; see also *Verbeck* v. *Clymer* (1927) 202 Cal. 557 [261 P. 1017]) since the latter is not subject to the usury laws. The articulated rationale for this distinction is that the owner of property" . . . may offer to sell at a designated price for cash or at a much higher price on credit, and a credit sale will not constitute usury however great the difference between the two prices, unless the buying and selling was a mere pretense; and it has been held that it is not material that the agreement for the purchase price in the future, instead of specifying the whole sum then to be paid, names a particular sum as principal, and declares that it shall draw interest at a rate which, were the transaction a borrowing and lending, would clearly be usurious . . . ." (*Verbeck* v. *Clymer, supra,* 202 Cal. at p. 563.)

Underlying the judicial approval of what can best be described as the artificial distinction between a credit sale and a loan of money is the

perception that the Legislature has given its broad approval to the credit sale principle as an exception to the usury law.[1] It is deemed sufficient that the consumer receive the legislatively sanctioned benefits of flexible credit arrangements rather than being denied those benefits because of the rigidity of the usury laws. (*Boerner* v. *Colwell, supra,* 21 Cal.3d at p. 46.) Thus, based on this principle the initial transaction between the Smiths and DCM was not usurious. (See also 62 Ops.Cal.Atty.Gen. 735 (1979).) The question presented here is whether it became usurious when the secured note was modified to provide for increased interest.

## III

Initially we note our unwillingness to accede to Smith's request that we decide this case on the technical ground that the agreement to increase the rate of interest and extend the due date of the note occurred *before* the note was due and not afterward. Smith says the timing of this event is crucial, claiming that where the agreement precedes the due date there can be no "forbearance." She supports her position by directing us to *Eisenberg* v. *Greene* (1959) 175 Cal.App.2d 326 [346 P.2d 60] where "forbearance" is defined as " ' "the act by which a creditor waits for the payment of a debt due him by the debtor *after* it has become due" ' " (*Id.* at p. 330, quoting *Murphy* v. *Agen* (1928) 92 Cal.App. 468, 469 [268 P. 480], italics added) and to *Crestwood Lumber Co.* v. *Citizens Sav. & Loan Assn.* (1978) 83 Cal.App.3d 819 [148 Cal.Rptr. 129] where "forbearance" is said to be an "extension of time for payment of a debt due" (at p. 824). These decisions, however, do not suggest their respective definitions of "forbearance" were intended to be all-inclusive. ■ Moreover, we can not overlook other precedent where "forbearance" is simply defined as " 'an agreement not to enforce a claim at its due date.' " (*Ibid.*) (See, e.g., *Buck* v. *Dahlgren* (1972) 23 Cal.App.3d 779, 785 [100 Cal.Rptr. 462]; *Calimpco, Inc.* v. *Warden* (1950) 100 Cal.App.2d 429, 440 [224 P.2d 421] (disapproved on other

---

[1] From the consumer's perspective the difference between a deferred purchase price and a loan is indeed academic. Illustrative of this is the following: " 'Take the case of a buyer who desires to purchase a $1500 automobile but has only $500 in cash. If he borrows the $1,000 balance from a [non-exempt lender] for one year at a charge of $100, the usury statute applies. If, on the other hand, he buys the same automobile under a conditional sales contract, the time price will probably be quoted as $1,600 and the seller will discount the $1,100 balance of the contract to a sales finance company for $1,000, leaving the finance company a $100 profit on its advance. Under the cash-price-time-price dichotomy, the usury act would fail to protect the buyer in the second transaction, even though the credit-sale financing is similar, in several significant respects, to the direct-loan financing. In neither case does the seller finance the sale or the buyer have sufficient money to pay for the article immediately. In both cases, the advance of money is made by a financial institution, and in both the buyer pays a sum of money over and above the article's cash price for the privilege of deferring payment.' " Warren, *Regulation of Finance Charges in Retail Instalment Sales* (1959) 68 Yale L.J. 839, 842, quoted in *Boerner* v. *Colwell, supra,* 21 Cal.3d at p. 46, fn. 10.)

grounds in *Fazzi* v. *Peters* (1968) 68 Cal.2d 590 [68 Cal.Rptr. 170, 440 P.2d 242].) The phrase "at its due date" qualifies when the claim will not be enforced, not the date on which the parties agreed to extend the time for payment. (See also 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 482, p. 431.) This is consistent with the facts of *Buck* v. *Dahlgren, supra,* where the agreement constituting the forbearance and the obligor/trustor's payment of the alleged usurious premium was made before the foreclosure sale which the parties agreed to postpone. Thus, forbearance within the meaning of the usury law is an agreement to extend the time for payment of the obligation due either *before or after* the obligation's due date.[2] In light of our conclusion we are unable to use the date of the agreement modifying the note and trust deed in this case as the linchpin on which we can rest our decision.

## IV

We frankly admit that absent legislative direction or persuasive precedent a factor underlying our conclusion that this transaction was not usurious is the discomforting unfairness if we were to conclude otherwise. This unfairness is best illustrated through the following hypothetical. Let us assume that when the parties in this case agreed to 10 percent interest the maximum allowable interest was 8 percent. Let us assume further that within a few days after the initial transaction they agreed to reduce the interest to 9 percent for no other reason than Smith's concern with DCM's financial well-being. If we were to accept DCM's argument, the reduced interest rate would be usurious even though the higher rate was not. It seems to us that the "law" should function in a rational manner to avoid a somewhat absurd and clearly inequitable result where the parties themselves are unable to distinguish between the bargains except for the date on which each was made. Powerful reasons should exist before the law transmutes a legal transaction into an illegal one, particularly where the illegality places the entire financial burden on one party with the other seemingly unjustly enriched by having the benefit of an interest-free loan.[3]

---

[2] We believe this conclusion is consistent with the definition of forbearance set out in Justice Mosk's dissenting opinion in *Southwest Concrete Products* v. *Gosh Construction Corp., supra,* 51 Cal.3d 701, where he said a loan and forbearance are "two sides of the same coin," explaining "there is forbearance when, *at the time a debt matures,* the creditor (1) agrees to refrain ('forbear') from enforcing the debt immediately, and instead (2) agrees to give the debtor additional time to pay." (*Id.* at p. 710, italics in original.) Absent citations or a statement of exclusivity we do not interpret Justice Mosk's definition as being all-inclusive precluding a forbearance where the agreement is entered into before the debt matures. The respected commentators, Miller and Starr, are more categorical defining "forbearance" as the "act of the lender or creditor delaying the payment of a debt due to him 'after it has become due.' " (4 Miller & Starr, Cal. Real Estate (2d ed. 1975) § 10.5, p. 661.) Again, however, lacking authority we are unwilling to use their definition as the basis for our holding.

[3] "The inclusion of a usurious interest provision . . . results, in effect, in a note payable at maturity without interest." (*Epstein* v. *Frank* (1981) 125 Cal.App.3d 111, 123 [177 Cal.Rptr.

In addition we are cognizant of the general principle that "a debtor by voluntary act cannot render an otherwise valid transaction usurious. '[A] debtor cannot bring his creditor to the penalties of the Usury Law by his voluntary default in respect to the obligation involved where no violation of law is present at the inception of the contract.'" (*Southwest Concrete Products* v. *Gosh Construction Corp., supra,* 51 Cal.3d at p. 706, quoting *Sharp* v. *Mortgage Security Corp.* (1932) 215 Cal. 287, 291 [9 P.2d 819].) Here had Smith been both sophisticated and prescient he would have responded to DCM's request by insisting the parties proceed in a technically rigid manner with Smith buying the property at a foreclosure sale following DCM's default or accepting a deed in lieu of foreclosure thereby permitting another sale with an interest rate on the secured debt in excess of that set by the usury laws. If the parties could lawfully avoid the usury laws indirectly by going through the foregoing convoluted process, there should be no reason why they should not be able to do so directly.[4]

The general principle noted above precluding a debtor's voluntary action from making a nonusurious transaction usurious seems to be applicable here in light of DCM's implied request to avoid the time, risk and expense of the more complicated process of reacquisition and sale.

## V

In asserting the fundamental difference between the original transaction giving rise to the secured note and the later dealings resulting in a modification to that note DCM relies on the California Supreme Court decision in *Boerner* v. *Colwell Co., supra,* 21 Cal.3d 37. *Boerner* was not decided on mere technical grounds with the court pointing out the clear differences between the sale and a loan or forbearance of money. Rather *Boerner* reflects the thinking of a sharply divided court where a four-person majority relying on policy considerations categorized the transaction as a credit sale while the three-person minority described the transaction as a loan of money. While we have no desire to perpetuate this debate we think it important to emphasize that *Boerner* was decided on more than the mechanics of the transaction. This decision reflects the difficulty in clearly differentiating between bargains which are loans of money and those which are not. More significantly, however, it reflects our high court's approval of

---

831]; see also Deering's Ann. Uncod. Measures 1919-1 (1973 ed.) § 2, p. 40.) The unjust enrichment in favor of the borrower can be particularly dramatic during times of inflation where the buyer's use of the interest-free money results in substantial profit because of the increase in the value of the property over the period of the loan.

[4] Arguably where the parties' agreement to resell is made *before* the foreclosure the transaction might constitute a forbearance under the usury law. However, where there is no prior agreement to sell the property back to the borrower after the foreclosure sale for an increased price or for an increased rate of interest on the secured note, the transaction is not usurious. (4 Miller & Starr, *supra,* § 10.5, p. 668.)

judicial analysis which focuses on the commercial benefits resulting from its decision. This concern is made more apparent by the majority's acknowledgement there probably was not any "real" difference between a loan of money and deferred price deferential (*ante,* p. 735, fn. 2.), but its willingness, nonetheless to perpetuate artificial distinction in order to treat the transaction as a credit sale with its resultant benefits to the consumer, freed from the constraints of the usury law. (21 Cal.3d 37; see also 4 Miller & Starr, *supra,* § 10.4, p. 656.)

Applying a similar analytical approach here, we conclude the cost to the consumer in holding the transaction usurious outweighs any potential benefit. To declare a privately negotiated bargain as illegal where the original bargain was not, will only chill the willingness of nonexempt lenders to extend credit in private transactions where there is no apparent unlawfulness in so doing. Examining this issue in hypothetical terms, Miller and Starr state: "Although technically the continuation of a loan past its original due date is in effect a new loan, the lender is actually benefitting the borrower by not demanding payment. The lender who wishes to accommodate the borrower either must force the borrower into a hardship position to pay or lose the security for the loan, or extend the loan and commit usury, or incur the expense of additional broker's fees by requiring the extension to be negotiated by a broker [thereby making the transaction exempt]. The imposition of the usury limitations in such cases merely harms the impecunious borrower that the law is intended to protect." (4 Miller & Starr, *supra,* § 10.12, p. 704.) Because the law should not be seen as an intrusive arm of government, desirous of remaking privately negotiated bargains, we hold the usury law is inapplicable to the modified secured note.[5]

## VI

We also believe that treating the modified note as usurious is anomalous where the modified note retains its character as a purchase money instrument depriving Smith of any right to seek a deficiency upon DCM's default. (Code Civ. Proc., § 580b.)[6] ■ It is now well established that as a general rule where a note is created as a purchase money note it remains as such

---

[5] We wish to emphasize that Smith did not receive any additional charges, fees or consideration other than to increase the interest rate to reflect market conditions. Miller and Starr qualify their comments quoted above by concluding the transaction should be treated as exempt only if the interest rate on the secured note remains the same or is less than that on the original loan. (*Ibid.*) As our opinion reflects, we reject this qualification.

[6] Code of Civil Procedure section 580b provides in pertinent part: "No deficiency judgment shall lie in any event after a sale of real property or an estate for years therein for failure of the purchaser to complete his or her contract of sale, or under a deed of trust . . . given to the vendor to secure payment of the balance of the purchase price of that real property . . . ."

even though the terms of that note may be altered, modified or extended provided the obligation is secured by the same property. (See *Palm* v. *Schilling* (1988) 199 Cal.App.3d 63, 76 [244 Cal.Rptr. 600].) There can be no question here that if Smith had been required to foreclose on the modified note she would have been governed by the provisions of section 580b. "The explicit language of section 580b brooks no interpretation other than that deficiency judgments are prohibited by the purchase money mortgagee so long as a purchase money mortgage or deed of trust is in effect on the original property. . . . If the purchase money creditor retains an interest in the original property, the debtor cannot be held for a deficiency. If the purchase money creditor does not wish to accept the risk that the property will be lost through foreclosure by another secured creditor, the remedy is to either foreclose himself or destroy the purchase money nature of the transaction . . . ." (*Palm* v. *Schilling, supra*, at p. 76.) ▮ Thus treating the transaction here as retaining its nonusurious character is consistent with the law's unwillingness to change the modified secured note into a nonpurchase obligation. Where the law insists the legal effect of the bargain continues for one purpose, absent valid reasons that same bargain should continue for other purposes.

## VII

DCM principally relies on *In re Pillon-Davey & Associates* (Bankr. N.D.Cal. 1985) 52 Bankr. 455 and *Clarke* v. *Horany* (1963) 212 Cal.App.2d 307 [27 Cal.Rptr. 901, 4 A.L.R.3d 643] in asserting that we must treat the interest on the modified note as usurious. We find neither case persuasive.

The facts of each are dramatically different than this case. In each of the cited cases the beneficiary of the secured note extracted a substantial cash premium as part of the consideration for the modification.

DCM stresses that *Pillon-Davey* involving the extension of time for payment of the secured note and an increase in the interest rate from 16 percent to 22 percent is directly in point. *Pillon-Davey* states "there could be no credit sale since [the trustor] had nothing to sell Pillon-Davey. Pillon-Davey owned the real property, subject to the beneficial trust deed interest of [the trustor] CCWD. CCWD was in no position to negotiate, or renegotiate, the sale of the property. . . . The only interest CCWD had in the property was as the beneficiary under a deed of trust, entitling it to foreclose upon the property if Pillon-Davey defaulted on the underlying note. *Thus, the only thing it had to 'sell' in 1981 was its right to foreclose.*" (*Pillon-Davey* 52 Bankr. at pp. 458-459, italics added.) DCM argues the facts here are the

same because in 1987 Smith also had nothing to sell to DCM Partners. While the analogy may be apt, we reject *Pillon-Davey*'s reasoning.

In saying Smith had nothing to sell DCM wishes to minimize the value of Smith's "right to foreclose." While there is a significant difference between a trustor of a secured note and an equity owner of improved real property, the latter status can be readily achieved by the former in a case like the one before us. Had the Smiths declined DCM's invitation to renegotiate they would have entered DCM's default when it failed to make the balloon payment on the due date of the note and foreclosed on the property. At a modest cost the Smiths would have become owners in the property with DCM losing its payments on principal and any increased equity resulting from appreciation. Thus the same factors influencing the Smiths' initial decision to sell were present when they later agreed to renegotiate the note. These factors included the parties' respective desires to be an equity owner of improved real property or a secured lender, interest rates on loans available from institutional lenders and tax benefits such as the deferral of gain to the seller on an installment sale and the deductions available to the buyer for interest payments. From our perspective *Pillon-Davey*'s depiction of the parties as being in substantially different circumstances when they renegotiated the secured note compared to their position at the time of initial sale is not borne out by the realities of the transaction.

In *Clarke* v. *Horany, supra,* 212 Cal.App.2d 307, the parties did *not* contest a violation of the usury laws limiting the controversy to whether the premium of $4,000 paid to the beneficiaries' agent could be considered as a direct payment to the beneficiaries to determine whether there was usury. After deciding this issue against the beneficiary the court remanded the case for a new trial. ▆ Because a case does not stand for a proposition neither discussed nor analyzed (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689]), it has no precedential value on the issue before us.[7]

Based on the foregoing we hold the transaction modifying Smith's secured note is exempt from the usury law. We therefore reverse the judgment with instructions.

---

[7] A case raising the same issue as presented here but not cited by the parties is *Lakeview Meadows Ranch* v. *Bintliff* (1973) 36 Cal.App.3d 418 [111 Cal.Rptr. 414] also involving an extension of a purchase money note. Although the court did not discuss whether the purchase money exemption applied to the note's extension, it implied it did not, determining the interest charged was not usurious. We do not view the implied conclusion in *Lakeview Meadows Ranch* as binding precedent in light of the general rule that a case cannot stand for a proposition neither discussed nor analyzed.

## DISPOSITION

The judgment of the superior court is reversed with instructions to direct the municipal court to enter judgment for the defendant. DCM to bear all costs for this appeal.

Work, J., and Benke, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 23, 1991. Mosk, J., was of the opinion that the petition should be granted.