Filed 5/13/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FRONT LINE MOTOR CARS, | |
| Plaintiff and Appellant, | G056061 |
| v. | (Super. Ct. No. 30-2017-00928836) |
| KATHLEEN K. WEBB, as Acting Director, etc., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Derek W. Hunt, Judge. Affirmed.

Prenovost, Normandin, Bergh & Dawe, Michael G. Dawe, Charles "Mike" Michaelis, and Nichole M. Wong for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Chris A. Knudsen, Senior Assistant Attorney General, and Kenneth C. Jones, Deputy Attorney General, for Defendant and Respondent.

\*      \*      \*

In two unrelated transactions, Front Line Motor Cars (Dealer), a used car dealer licensed by the Department of Motor Vehicles (DMV), repossessed cars after the buyers failed to obtain financing.[1] Dealer then refused to return the buyers' down payments. The buyers complained to DMV. DMV instructed Dealer to refund the buyers' down payments. Dealer refused, asserting its actions were proper under the Rees-Levering Motor Vehicles Sales and Finance Act (Civ. Code, § 2981 et seq.; the Act) and that DMV lacked the power to sanction Dealer.[2]

DMV then brought a disciplinary action against Dealer. DMV accused Dealer of violating sections 2982.5, 2982.7, and 2982.9, which are the only sections of the Act which require a seller to refund a buyer's down payment upon the buyer's failure to obtain financing. After an administrative hearing, DMV adopted the administrative law judge's proposed order that Dealer's license be conditionally revoked for two years due to Dealer's violation of the Act. Dealer petitioned the superior court for a writ of administrative mandate, which the superior court denied.

On appeal Dealer repeats the same arguments it made below. Dealer is wrong. The Act does not sanction Dealer's predatory conduct nor does it leave DMV powerless to stop such abuse. As we shall explain, under the unique facts in this case (which reveal Dealer lacked a good faith intent to enter into bona fide credit sales with the buyers), the transactions involved seller-assisted loans subject to section 2982.5 of the Act, which expressly required Dealer to return the buyers' down payments.[3]

---

[1] In this opinion we use the terms "repossess" and "repossession" colloquially to refer to Dealer's taking back the cars, *not* in the legal sense of a seller exercising a contractual remedy upon the buyer's default.

[2] All further statutory references are to the Civil Code unless otherwise stated.

[3] We discuss section 2982.5's provisions on seller-assisted loans in more detail in the Discussion section of this opinion.

Accordingly, we affirm the judgment.[4]


FACTS


*DMV's Accusation*

Vehicle Code section 11705, subdivision (a)(12) authorizes DMV, upon notice and hearing, to suspend or revoke the license of a dealer who violates the Act. DMV's accusation against Dealer alleged Dealer failed to return the buyers' down payments after the buyers were unable to obtain financing in accordance with the contractual terms. The accusation alleged Dealer violated sections 2982.5, subdivision (b), 2982.7, and 2982.9 of the Act, and prayed for revocation or suspension of Dealer's license and an order that Dealer pay restitution to persons who suffered financial loss.


*Administrative Hearing*

At the hearing before an administrative law judge (ALJ), the testimony and documentary evidence showed the following.

Twyla Davis purchased a car from Dealer. At Dealer's office, Davis applied for financing from First Credit Finance (Financier). Davis paid a $2,000 down payment and was obligated under the retail installment sale contract to pay an additional deferred down payment of $500 two weeks later. One week after Davis signed the contract, Dealer told her she was to return the car because financing had been denied. Three or four days after hearing from Dealer, and on the same day she received the declination letter from Financier, Dealer repossessed the car. Davis asked Dealer to

---

[4]  The court's order denying Dealer's writ petition constituted a final determination of the entire action. We thus "construe the order to be an appealable final judgment." (*Consaul v. City of San Diego* (1992) 6 Cal.App.4th 1781, 1792, fn. 6.)

refund her down payment. Dealer refused, telling Davis she would have to sue Dealer in court for the money.

Zaneicesha Phillips paid Dealer a $3,800 down payment and was obligated under the retail installment sale contract to pay an additional deferred down payment of $500. She had constant mechanical trouble with the car and tried to return it, but Dealer refused, saying the deal was "finalized." After the car was repossessed and Dealer's manager told Phillips the loan was denied, Phillips requested a refund of her down payment. The manager "laughed and said, 'No way, . . . your loss . . . take us to court.'"

Davis and Phillips filed separate complaints against Dealer with DMV. Wendell Lauderdale, a DMV investigator, and his partner interviewed Dealer's owner, Omar Torres. Torres stated the Davis and Phillips sales were unwound due to an inability to obtain financing. Torres stated he did not plan to refund Phillips' down payment and that he had resold the car to another customer. He further stated he did not plan to refund Davis' down payment and intended to resell the car to another buyer. Torres showed Lauderdale a copy of section 2983.3 (concerning acceleration of maturity and rights of reinstatement following repossession) and of the installment sale contract (which Torres had partially highlighted with pink marker). Torres believed these documents gave him the "legal right to do what he did" and "not refund monies." Torres declared this "was a civil matter and [he] would gladly litigate with the customers if necessary." Lauderdale replied that, as a criminal investigator, he did not wish to "hurt" Torres but wanted to give him an opportunity to pay back Davis and Phillips.

Torres has a bachelor's degree in finance and a master's degree in business administration. Prior to becoming a car dealer, he worked for 14 years in the automobile finance industry. In that capacity, he would review a "credit application, time on the job, income, debt-to-income ratio, [and] loan-to-value ratio." He would "go beyond the credit score and look at the actual trade lines," and the applicant's total debt, creditworthiness, and ability to pay. He was "intricately knowledgeable" in the field.

4

Torres resold the vehicles he repossessed from Davis and Phillips to other buyers.

In response to questioning by DMV's counsel, Torres estimated that about 25 percent of Dealer's sales called for a deferred down payment. When DMV's counsel asked whether 90 percent of these transactions resulted in a repossession and resale of the vehicle, Torres replied, "No." But when DMV's counsel asked whether 80 percent of these transactions resulted in a repossession and resale of the vehicle, Torres could not deny it, replying, "I have no idea."

*DMV's Decision*

DMV adopted the ALJ's proposed decision as the final decision. The ALJ's factual findings included: Davis purchased a car from Dealer "pursuant to a conditional sales contract which required an approval of funding for the contract to be completed" (fn. omitted), and paid Dealer $2,000 as a down payment. Dealer submitted a loan application to Financier on Davis' behalf. Six days later, Financier notified Davis it could not approve her application because her income was below its minimum requirement and her employment could not be verified. That same day, Dealer sent a tow truck to Davis' home and removed the car. Despite Davis' attempt to obtain a refund, no part of her down payment was refunded.

Phillips purchased a car from Dealer "pursuant to a conditional sales contract which required an approval of funding for the contract to be completed," and paid Dealer $3,800 as a down payment. Dealer submitted a loan application to Financier on Phillips' behalf. Financier notified Phillips it could not approve her application because Financier lacked certain documentation and information needed to complete the financing. Phillips learned from Dealer that Financier had denied her loan application only after the car had been towed away. Less than 30 days after Phillips purchased the car, Dealer "removed the car from Phillips' place of employment. [Dealer] subsequently

5

sold the car to another buyer." Despite Phillips' request for a refund, no part of her down payment was refunded.

"Torres testified at the hearing. He asserted that [Dealer] ha[d] no legal obligation to return the down payments to Davis or Phillips after retrieving the vehicles. Torres contended that [Dealer] was legally entitled to retrieve the vehicles because the buyers had not provided valid employment or salary information on the credit application. . . . [Dealer] asserted that Davis had committed fraud by falsely claiming she was employed by Maxim Healthcare Services on her credit application. Davis testified credibly that the information she provided on her credit application was truthful and that she was employed at Maxim Healthcare Services when she applied for credit. [Dealer] failed to present sufficient evidence to refute Davis' testimony."

"After performing credit checks, [Financier] decided not to grant credit to Davis and Phillips and sent notice that it was denying their applications for vehicle financing." Financier "clearly acted as a lender in these transactions, rather than a third party investor."

Dealer wrongfully refused to return the buyers' down payments after the buyers failed to obtain financing. Dealer "did not establish that it suffered any financial detriment in regard to the sale of the [cars]. After [Dealer] unwound the sales and took back the vehicles, the cars were returned to [Dealer's] inventory to be resold to other purchasers. [Dealer] failed to establish a valid basis for its refusal to refund the down payments . . . ."

The ALJ's legal conclusions included: DMV had cause to discipline Dealer for violating sections 2982.5, subdivision (b), 2982.7, and 2982.9. Dealer relied on *Kunert v. Mission Financial Services Corp.* (2003) 110 Cal.App.4th 242 (*Kunert*), but *Kunert* is distinguishable. The facts here clearly establish a seller assisted loan under section 2982.5. Dealer "does not acknowledge any wrongdoing whatsoever and has not

6

established rehabilitation." The "public can only be protected by revocation stayed and issuance of a probationary license."

The ALJ's proposed decision, adopted in its entirety by DMV, ordered Dealer's license revoked, then stayed the revocation for two years on condition, inter alia, that Dealer be on a probationary license and make immediate restitution to Davis and Phillips.

*Petition for Writ of Administrative Mandate*

Dealer petitioned the Superior Court for a writ of administrative mandate under Code of Civil Procedure section 1094.5. In its opening and reply briefs, Dealer argued that section 2982.5, subdivisions (b) and (d) did not apply to the Davis and Phillips transactions because, under *Kunert*, those deals involved "completed conditional sales contracts and not seller assisted loans."

The court denied Dealer's petition.

DISCUSSION

*We Do Not Presume the Superior Court Applied the Wrong Standard of Review*

Dealer contends the superior court "incorrectly applied the 'traditional mandate' standard of review [(Code Civ. Proc., § 1085)] rather than the controlling 'administrative mandate' standard of review [(Code Civ. Proc., § 1094.5)]." Dealer argues the court "did not recognize [its] duty to conduct an independent review of the evidence" under Code of Civil Procedure section 1094.5.

Code of Civil Procedure section 1094.5 governs "judicial review of a final administrative determination by writ of mandate." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810 (*Fukuda*).) Under subdivision (b) thereof, the superior court determines whether an agency prejudicially abused its discretion by making findings unsupported by

7

the evidence.  "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the *weight* of the evidence."  (Code Civ. Proc., § 1094.5, subd. (c), italics added.)  Courts are authorized to exercise independent judgment on the evidence when an administrative decision "substantially affects a fundamental vested right."  (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32.)  As relevant here, independent judgment review applies to an administrative suspension of a professional license.  (*Fukuda*, at p. 811.)

But independent judgment review is subject to "sound" limits.  (*Drummey v. State Board of Funeral Directors & Embalmers* (1939) 13 Cal.2d 75, 86.)  "[C]onsiderable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing . . . ."  (*Ibid.*)  "It is presumed that official duty has been regularly performed."  (Evid. Code, § 664.)  "'*The findings of the* [*agency*] *come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence.*'"  (*Fukuda*, *supra*, 20 Cal.4th at p. 812.)

Dealer contends the court failed to consider whether DMV's findings were contrary to the weight of the evidence.  In its opening brief, Dealer argues:  "A closing remark by the court perhaps best evidences its apparent misapprehension of its role.  At page 19 [of the reporter's transcript, the judge] notes:  'But I'm not in a position to tell [the agency] you sized up the facts the wrong way.  I have to give [the agency] the same consideration that I expect to get from the Court of Appeal myself.'"  [5]  Without more,

---

[5]    In its reply brief on appeal, Dealer seems to retract its contention that the court failed to weigh the evidence.  In response to DMV's statement in its respondent's brief that, under *Fukuda*, *supra*, 20 Cal.4th at page 817, the petitioner "'bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence,'"  Dealer argues the requirement that a trial court must "'independently review

8

this statement merely suggests the court was doing no more than according "*a strong presumption of . . . correctness*" to the findings of the ALJ as required by *Fukuda*, *supra*, 20 Cal.4th at page 812.

Other statements by the court suggest the court understood the proper standard of review and that the proceeding was not one of ordinary mandate under Code of Civil Procedure section 1085. At the hearing on Dealer's writ petition, the court stated, "This is a petition for administrative mandate." Less than two months later, the court held a hearing for "additional oral argument for administrative mandamus."

In the absence of a statement of decision, "all intendments favor the ruling below [citation], and we must assume that the trial court made whatever findings are necessary to sustain the judgment." (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793, superseded by statute on another point.) Moreover, it is a tenet of appellate review that an "'order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.'" (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 718.)

Thus, we will not presume the trial court applied the wrong standard of review.

*DMV's Accusation Alleged Dealer Violated Sections 2982.5, 2982.7, and 2982.9.*

DMV's accusation alleged Dealer violated sections 2982.5, subdivision (b), 2982.7, and 2982.9 of the Act, and therefore DMV was authorized to discipline Dealer by suspending or revoking its license pursuant to Vehicle Code section 11705, subdivision (a)(12).

Section 2982.7 applies to conditional sales contracts (§ 2981, subd. (a)) for the sale of vehicles under the Act. Section 2982.7, subdivision (a) provides: "Any

an administrative [agency's] factual findings'" is not "relevant to the disposition of this appeal" because the facts here are "uncontested."

9

payment made by a buyer to a seller pending execution of a conditional sale contract shall be refunded to the buyer in the event the conditional sale contract is not executed."

We have found no case law interpreting this section. One might assume "execution" of the contract means the signing of the document by all parties. (But see Veh. Code, § 5901, subd. (d) [for purposes of requirement that dealer notify DMV of transfer of vehicle, sale is "deemed completed and consummated" when purchaser alone signs contract and takes possession of vehicle].)[6]

Sections 2982.5 and 2982.9, in contrast, involve loans between the buyer and a third party lender. Section 2982.9 applies to a buyer's attempt to obtain a direct loan from a lender, and provides: "In the event a buyer obligates himself to purchase . . . a motor vehicle pursuant to a contract . . . , and the seller knows that the buyer intends to

---

[6] We take judicial notice of the legislative history of the Act. (*Maryland Casualty Co. v. Andreini & Co.* (2000) 81 Cal.App.4th 1413, 1420, fn. 10.) In 1961, the Assembly Interim Committee on Finance and Insurance issued a report after conducting a 10-month "extensive investigation into the practices and activities of automobile dealers" in sales and financing. (Assem. Interim Committee on Finance and Insurance, Rep. on Assem. Bill No. 2252 (1961 Reg. Sess.) Appen. to Assem. J., p. 7 (Interim Committee Report).) The committee concluded, inter alia, "New legislation to remedy deficiencies in existing law is necessary if California is sincere in attempting to extend automobile buyers protection analogous to that provided purchasers of other types of personalty on retail installment contracts . . . ." (*Id*. at p. 39.) The findings of the Committee led to the repeal of the [prior Automobile Sales Act] and to the enactment of" the Act. (Goldberg & Goldman, *Recent Legislation: The Rees-Levering Motor Vehicle Sales and Finance Act* (1962) 10 UCLA L.Rev. 125, 127.)

Among "the major areas of abuse[,] malpractice[,]" legal ambiguities, and deficiencies was the "FAILURE TO DELIVER FULLY EXECUTED COPY OF CONTRACT AT TIME OF SALE." (Interim Committee Report, *supra*, at p. 9.) The committee concluded, "The only way to ensure that the buyer has an opportunity to know his exact position at the time of agreement and the only way to discourage problems of proof that will arise in later litigation, is to insist upon a definite and well-defined time of closing, with no loose ends left to be tied up later which will provide either party with the opportunity to complain that the deal is no longer exactly the deal originally agreed upon." (*Ibid.*)

When the deal is contingent upon financing, all loose ends are not necessarily tied up upon the signing of the contract by the seller and the buyer.

10

obtain financing from a third party without the assistance of the seller, and the buyer is unable to obtain such financing, the contract . . . shall be deemed rescinded and all consideration thereupon shall be returned by the respective parties without demand."

Section 2982.5, subdivisions (b) and (d) apply to seller-assisted loans. They establish *an exemption from the Act* for a seller-assisted loan from a lender to the buyer to pay either the down payment or the purchase price, respectively, or any part thereof, if certain specified conditions are met. Among these conditions is the requirement that, if the buyer fails to obtain the loan, on the conditions stated in the conditional sale contract, then the conditional sale contract "shall be deemed rescinded and all consideration thereupon shall be returned by the respective parties without demand." (*Id*., subds. (b), (d)(5).)[7]

Our analysis will focus on section 2982.5 to determine whether Dealer violated the Act, thereby subjecting itself to discipline by DMV. In this regard, we observe that Dealer — by defending itself on the merits below against DMV's arguments that Dealer violated subdivision (d) — has forfeited the defense that DMV's accusation

---

[7] Subdivisions of section 2982.5 are short cited herein by their subdivision designation.

Subdivision (d) provides: "This chapter may not be deemed to prohibit the seller's assisting the buyer in obtaining a loan from any third party to be used to pay for the full purchase price, or any part thereof, of a motor vehicle, if each of the following provisions applies:" "(5) If the buyer becomes obligated to purchase, or receives possession of, the motor vehicle prior to obtaining the loan [and if] the buyer upon proper application for the loan is unable to obtain the loan, on the condition stated in the agreement between the buyer and the seller, the agreement shall be deemed rescinded and all consideration thereupon shall be returned by the respective parties without demand."

Subdivision (b) provides: "This chapter may not be deemed to prohibit the seller's assisting the buyer in obtaining a loan upon any security from any third party to be used as a part or all of the downpayment or any other payment on a conditional sale contract . . . . If the buyer obligates himself or herself to purchase, or receives possession of, the motor vehicle prior to securing the loan, and if the buyer upon appropriate application for the loan is unable to secure the loan, on the conditions stated in the conditional sale contract, the conditional sale contract . . . shall be deemed rescinded and all consideration thereupon shall be returned by the respective parties without demand."

11

did not include that charge.  (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264 ["forfeiture rule generally applies in all civil and criminal proceedings"].)  Further, the gist of DMV's accusation was simply that Dealer "failed to return the buyer's down payment after the buyer was unable to obtain financing for the vehicle pursuant to the terms stated in the conditional" sale contract.  And Dealer anticipated the invocation of subdivision (d) when it stated in its hearing brief in the administrative proceeding that DMV was no doubt relying on subdivision (d), but that (under *Kunert, supra*, 110 Cal.App.4th 242) subdivision (d) "is simply not applicable."  Thus, Dealer had a full opportunity to respond to the invocation of subdivision (d), in both the administrative proceeding and the mandate proceeding below.

*The Law Distinguishes Between Credit Sales and Loans*

The distinction between a conditional sale contract (more generally known as a credit sale) and a loan is central to the analysis in this case.  A conditional sale contract under the Act may *include* financing, whether provided by the seller or, alternatively, by a financial institution to which the seller assigns the contract.  In that case, the entire transaction is subject to the Act's consumer protections.  (*Kunert, supra,* 110 Cal.App.4th at pp. 254, 258.)  On the other hand, the buyer may obtain an independently arranged third party loan or a seller assisted loan not subject to the Act except as specifically stated in sections 2982.9 and 2982.5, respectively.  (*Kunert*, at p. 258.)

The distinction between credit sales and loans is the focus of the case law discussed below.

A.  *Boerner*

We begin with *Boerner v. Colwell Co.* (1978) 21 Cal.3d 37 (*Boerner*), the seminal case differentiating a credit sale from a loan.  *Boerner* examined an issue

12

different from the one before us.  The question posed to the *Boerner* court was whether the defendant mortgage banking firm had made usurious loans.  (*Id.* at pp. 40-41.)  Here, in contrast, DMV has not alleged usury or any other misconduct by Financier, but rather, wrongful withholding of money by Dealer.  Nonetheless, *Boerner's* discussion of credit sales is where we must start.

In *Boerner*, *supra*, 21 Cal.3d 37, certain builders and their landowner customers entered into installment contracts for the construction of vacation homes, and the defendant mortgage banking firm financed the transactions by buying the contracts from the builders.  (*Id.* at p. 41.)  The defendant, by virtue of its "significant involvement . . . in the development and consummation of the bargain between the buyer and the builder," played a central role "in shaping the transactions from the outset." (*Id.* at p. 50.)  The buyers desired financing for the construction of their vacation homes. (*Id.* at p. 42.)  In order to provide such financing, the builders followed the defendant's mandated process for obtaining funding at an interest rate higher than allowed under usury law.  (*Id.* at pp. 43-44, fns. omitted.)  The defendant supplied forms — including a credit application and a deed of trust — which were to be signed by the builder and the buyer (*id.* at p. 41), and which "essentially set forth the terms under which [the defendant], through the device of contemporaneous assignment at a prearranged discount, would agree to finance the contemplated purchase and sale" (*id.* at pp. 50).  The defendant evaluated "the buyer's credit reliability, and only when *it* determined that such credit reliability was acceptable to *it* did it agree to participate in the transaction[] as the financing agent."  (*Id.* at pp. 50-51.)  The defendant would notify the builder and the landowner of the defendant's purchase of the contract and would pay the builder for the contract.  (*Id.* at p. 42.)  The buyer then became "bound to pay [the defendant] the deferred purchase price (cash price plus finance charge), in monthly installments as reflected in the assigned lien contract — payment being secured by means of the assigned trust deed."  (*Ibid.*)

13

The landowner plaintiffs brought a class action for usury against the defendant mortgage banking firm. (*Boener*, *supra*, 21 Cal.3d at pp. 40-41.) The trial court ruled against the plaintiffs, finding the transactions were bona fide credit sale contracts assigned to the defendant, and not usurious loans. (*Id.* at p. 43.)

A four justice majority of our Supreme Court affirmed the trial court's judgment. (*Boerner*, *supra*, 21 Cal.3d at p. 54.) The majority opinion explained that, in determining whether a transaction is a loan, courts examine "the substance rather than the form of such transactions in assessing their effect and validity." (*Id.* at p. 44.) The issue is whether "the bargain of the parties, assessed in light of all the circumstances and with a view to substance rather than form, has as its true object the hire of money at an excessive rate of interest." (*Id.* at p. 44.) "The existence of the requisite intent is always a question of fact." (*Ibid.*)

Traditionally, in most jurisdictions, courts have held "a *bona fide* credit sale is not subject to the usury law because it does not involve a 'loan.'" (*Boener*, *supra*, 21 Cal.3d at p. 45, italics added.) This is because a seller may ""name the price on which he is willing to sell, and to refuse to accede to any other. He may offer to sell at a designated price for cash or at a much higher price on credit, and a credit sale will not constitute usury however great the difference between the two prices, *unless the buying and selling was a mere pretense*."" (*Ibid.*, italics added.)

The *Boerner* majority concluded: "It is this principle which lies at the foundation of consumer and commercial credit sales practices in this country, the massive finance industry which has grown up to service and facilitate those practices, and the body of statutory law which has been enacted to regulate the process for the common good. In California the basic laws in the consumer area, which among other things set limitations upon finance charges, are the Rees-Levering Act [citation], governing installment sales of motor vehicles, and the Unruh Act [citation], governing installment sales of other goods and services. These laws, it must be concluded, constitute a broad

14

legislative approval of the credit-sale principle as an 'exception' to the usury laws and a recognition that, whatever the rational weaknesses of the distinction on which it is based, practical considerations of significant moment justify the regulation of credit sales by a means more flexible than that provided by the usury laws." (*Boener*, *supra*, 21 Cal.3d at p. 46, fns. omitted.)

This principle applies only to "bona fide" credit sales, where, as a factual matter, the evidence shows the parties' dealings were made in good faith. (*Boener*, *supra*, 21 Cal.3d at pp. 50, 52.) For example, a bona fide credit sale would include "the case where the builder is able to finance the sale itself without institutional assistance." (*Id.* at p. 52.) If the evidence shows a bona fide intent between a seller and a buyer to consummate a credit sale, the participation in the transaction by a financing institution does *not* result in "a 'loan' subject to the usury laws." (*Ibid.*) "The role of the financing institution in transactions of this kind is basically a beneficial one, for the essence of their function is that of providing needed financial assistance to sellers unable to handle their own consumer financing, thus permitting those sellers to compete on a more equal footing with their more established competitors." (*Id.* at p. 53.)

Justice Mosk's dissent in *Boerner* agreed with the majority that whether a transaction is a credit sale or a loan is a factual question hinging on substance over form in light of "all the circumstances surrounding the transaction." (*Boener*, *supra*, 21 Cal.3d at p. 57 (dis. opn. of Mosk, J.).) Nonetheless, the three-justice minority concluded, "All of the facts in this case indicate that the transactions were loans, not credit sales." (*Id.* at p. 58.)

The disagreement in *Boerner* reveals that, in large part, policy considerations and the realities of industry practice underlie the distinction between credit sales and loans. "Underlying the judicial approval of what can best be described as the artificial distinction between a credit sale and a loan of money is the perception that the Legislature has given its broad approval to the credit sale principle as an exception to the

15

usury law. It is deemed sufficient that the consumer receive the legislatively sanctioned benefits of flexible credit arrangements rather than being denied those benefits because of the rigidity of the usury laws." (*DCM Partners v. Smith* (1991) 228 Cal.App.3d 729, 733-734, fn. omitted.) The "difference between a loan, which is subject to the usury laws, and a credit purchase . . . calculated on a time-price differential, which has traditionally been exempt from the usury statutes, is tenuous . . . ." (9 Williston on Contracts (4th ed. 2019) § 20:13, fn. omitted.)

B. *Kunert*

*Kunert*, *supra*, 110 Cal.App.4th 242, applied the credit sale/loan distinction in the area of automobile sales financing. In consolidated appeals, buyers sued "various individual lenders" (*id.* at p. 248), challenging the legality of arrangements whereby automobile dealers assign conditional sale contracts "to finance companies, and the finance companies pay the dealers a portion of the finance charges (called a 'dealer participation' or 'dealer reserve') due under the assigned contract" (*id.* at p. 247).[8] The plaintiff consumers asserted the dealer reserve was a commission prohibited under section 2982.5.[9] (*Kunert*, at pp. 247, 249.)

---

[8] Such an arrangement is "[f]requently used in the auto industry" and occurs where "a retail installment contract is sold in the secondary market under an arrangement in which the seller or originator of the contract (. . . often a dealer) 'splits' the difference between the annual percentage rate (APR) reflected on the face on the contract and the assignee's lower 'buy rate' (the buyer's minimum acceptable rate)." (Kelley, Jr., et al., *APR Splits: Still Legal After All These Years* (Summer/Fall 2002) 56 Consumer Fin. L.Q. Rep. 296.) Dealer participations are also referred to as "APR splits." (*Ibid.*) Nationwide, class action lawsuits against dealers for APR splits reflect "a relatively unsuccessful search for a legal 'wrong'" "absent evidence of serious dealer misconduct or affirmative misrepresentations." (*Id.* at p. 297.)

[9] Both subdivisions (b) and (d) specify that the seller may not "receive any commission or other remuneration for assisting the buyer to obtain the loan."

16

The *Kunert* court analyzed the issue in terms of the credit sale/loan dichotomy: "This case requires us to determine first whether the financing transactions described in the complaints are dealer-assisted loans — in which case the commission paid to the dealer is prohibited by [the Act] — or bona fide conditional sale contracts followed by assignments to the lenders — in which case the commission is not prohibited by [the Act]. California law clearly distinguishes between loans and *bona fide* credit sales, and allows financial institutions to shape and facilitate a credit sale between buyer and seller without transforming the transaction into a loan." (*Kunert*, *supra*, 110 Cal.App.4th at p. 252, italics added.)

The *Kunert* court found "no basis to conclude that the transactions are actually loans rather than conditional sale contracts, or that the transactions are structured to evade the consumer protections provided in the . . . Act." (*Kunert*, *supra*, 110 Cal.App.4th at p. 252, fn. omitted.) The *Kunert* holding was based on legal precedent and policy considerations. (*Id.* at p. 258.) As to legal precedent, *Kunert* found *Boerner* "compels" the conclusion that lender participation — even if it is extensive and controlling — does *not*, in and of itself, convert an otherwise *bona fide* credit sale into a loan. (*Kunert*, at p. 254; see *id*. at p. 257.) In this respect, the *Kunert* court emphasized that the facts before it were "not contested": "It is undisputed that the lenders pay the dealers a commission; indeed, such payments have been an integral part of the indirect auto finance market since at least the 1960's." (*Id.* at p. 256.) "[T]here is no question of good faith or intent . . . ." (*Ibid.*) "When parties intend to finance a *bona fide* sale of property, real or personal, the transaction is a credit sale, not a loan." (*Ibid.*, italics added.)

From a policy perspective, *Kunert* explained that if dealer participation were held to transform conditional sales contracts into seller assisted loans, consumers would lose the Act's protections other than those specified in section 2982.5. (*Kunert*, *supra*, 110 Cal.App.4th at p. 257.) The lost protections include the Act's requirements of

17

a single document (§ 2981.9) and single security (i.e., the vehicle) (§ 2984.2; *Kunert*, at p. 258). *Kunert* explained such a holding would be contrary to "a sensible construction of the statutory scheme." (*Id.* at p. 254.) The Act was *not* intended to protect consumers from a finance company's payment of commissions to dealers. (*Id.* at p. 257.) Rather, the Act "was directed at protecting the unwary, unsophisticated consumer against such evils as excessive interest charges; lack of full disclosures to the buyer; taking of security in addition to the car to assure repayment; the use of more than one document in connection with the sale and financing; and *lack of protection in the event of default and repossession*." (*Id.* at p. 258, italics added.)

*The Davis and Phillips Contracts Each Required Dealer to Refund the Buyer's Down Payment If Dealer Exercised Its Right to Cancel the Contract If It was Unable to Assign the Contract*

Before proceeding to our holding, we summarize relevant contractual provisions. In the Davis and Phillips transactions, dealer used "LAW® FORM NO. 563-CA (REV. 7/13)" entitled "RETAIL INSTALLMENT SALE CONTRACT — SIMPLE FINANCE CHARGE."

On the first page, a box for "SELLER ASSISTED LOAN" was left blank on both the Davis and Phillips contracts.

A separate box on page 1 concerns the seller's right to cancel and reads: "SELLER'S RIGHT TO CANCEL. If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply." Both Davis and Phillips signed this box.

In a large box toward the bottom of the second page is a section entitled, "Seller's Right to Cancel." The section reads: "a. Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit and assign the contract. You agree that if

18

Seller is unable to assign the contract to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel the contract. [¶] b. Seller shall give you written notice (or in any other manner in which actual notice is given to you) within 10 days of the date this contract is signed if Seller elects to cancel. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle."

*Dealer Lacked the Requisite Intent for a Seller in a Bona Fide Credit Sale*

In *Boerner* and *Kunert*, the sellers successfully assigned their contracts to finance companies, and the sales were consummated. As a result, an indisputable predicate fact in *Boerner* and *Kunert* is that the credit sales were *bona fide*. The issue in those cases was whether — given the buyers' and sellers' mutual intent to consummate bona fide credit sales — the participation of the finance companies converted the credit sales into transactions involving loans.

Here, in contrast, Financier refused to buy the Davis and Phillips contracts. Dealer thereupon took back the cars and wrongfully withheld Davis' and Phillips' entire down payments. The ALJ found (and the superior court affirmed the finding) that both contracts required funding for the purchase and sale transactions to be completed.

Implicit in a bona fide credit sale is (1) the buyer's intent to purchase the property and pay contractually required installments; and (2) the seller's intent to sell the property in a binding contract, but — if financing is denied — to rescind the contract and return the buyer's down payment as provided in the contract. Here, the overwhelming weight of the evidence was that Dealer intended to be bound *only* if it was able to assign

19

the contract to a finance company and, if unable to do so, to reclaim the car without restoring the buyer's down payment.[10]

Intent is a factual question elevating substance over form and taking into account all the circumstances. (*Boener*, *supra*, 21 Cal.3d at p. 45.) Substantial evidence supports the ALJ's implied factual finding (as affirmed by the superior court) that Dealer did not intend in good faith to enter into *bona fide* credit sales with Davis and Phillips.[11] Dealer's intent (i.e., Torres' mindset) must be viewed in light of (1) its conduct of repossessing used cars and reselling them while keeping the prior buyers' down payments — a behavioral pattern which recurred in a significant portion of its sales requiring the buyer's deferred down payment;[12] (2) its failure to abide by the contractual provision governing the seller's right to cancel, which required the seller to refund the buyer's consideration; (3) its challenging Davis and Phillips to sue it in court; (4) Torres' sophistication resulting from 14 years of prior employment in the automobile sale finance industry; and (5) Torres' presumption he could act with impunity under the Act. These circumstances show Dealer intended to enter into a binding contract only if and when the

_____

[10] At oral argument on appeal, Dealer insisted that upon the failure of the financing company to purchase the contract, the buyers could have simply made their monthly payments to Dealer. Nonsense. The argument raises a formalism that flies in the face of what happened here. There is no evidence that either Davis or Phillips was offered this accommodation. Instead, their cars were simply towed away.

[11] The "standard of review on appeal of the trial court's determination is the substantial evidence test." (*Fukuda*, *supra*, 20 Cal.4th at p. 824.)

[12] Dealer's counsel stated at the administrative hearing: "If he did this 95 times out of a hundred transactions, it's irrelevant. [¶] The question is: . . . Did he violate any of those three laws alleged in the Accusation?"
At oral argument on appeal, DMV's counsel pointed out that, unlike new cars, used cars do not depreciate when driven off the lot. Thus, there was no financial disincentive to Dealer's conduct.

20

*condition* of financing was met, and consequently, under these particular facts, the transactions involved attempted seller assisted loans.

Our conclusion must be viewed in the context of some harsh realities of the automobile sales world. Many of these hard truths were documented in the Interim Committee Report, which recommended passage of the Act. (*Hernandez v. Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 79.)

First, customers whose contracts require deferred down payments are particularly vulnerable and are the type of buyers who most need seller assisted loans, i.e., nonconventional financing.[13] (Conventional financing generally involves contract assignment and dealer participation; is ubiquitous in the automobile industry nationwide; and was the subject of the dispute in *Kunert*.) The legislative history of subdivision (d) reveals that an automobile dealer association requested the legislation, apparently desiring the ability to offer seller assisted loans to customers unable to qualify for conventional financing. (Assem. Com. on Finance and Insurance, Analysis of Sen. Bill No. 143 (1983-1984 Reg. Sess.) as amended May 5, 1983, p. 4.) The legislation enabled sellers to assist buyers "in obtaining financing from a supervised financial organization for the purchase of an automobile" and primarily helped "those prospective purchasers who were otherwise unable to qualify" for an automobile sales contract under the Act. (Assem. Com. on Finance and Insurance, com. on Sen. Bill No. 143, *supra*, June 7, 1983, pp. 1-2.) The evolving versions of the bill during the legislative process reveal the Legislature's intent to protect vulnerable buyers who cannot qualify for conventional financing. (Sen. Bill No. 143, *supra*, as introduced on Jan. 12, 1983; Sen. Bill No. 143, *supra*, as amended May 5, 1983.) "[T]hose with the lowest income and fewest economic resources are the most likely to be afforded a seller-assisted personal loan, rather than a

---

[13] For example, Davis was a Compton, California resident who worked as a personal care assistant for various clients of a home care provider. After Dealer repossessed the car, Davis was unable to work because she had no transportation.

21

regulated loan embodied in a conditional sale contract." (*Hernandez*, *supra*, 105 Cal.App.3d at p. 80.)

Second, customers rarely sue dealers. As stated in the general conclusions of the Interim Committee Report: "Where existing law provides a wronged individual with a legal remedy (as in the case of fraud) or with a legal defense (as in the case of violation of provisions of the Civil Code governing the sale of motor vehicles), such an individual seldom avails himself of those legal rights and remedies because they are generally too expensive and of too little practicable value to him to be worth his while to pursue." (Interim Committee Report, *supra*, at p. 38.)

Third, a known form of dealer misconduct is the wrongful retention of down payments. (Goldberg & Goldman, *Recent Legislation: The Rees-Levering Motor Vehicle Sales and Finance Act*, *supra*, 10 UCLA L.Rev. at pp. 126-127, 135.)

Fourth, a small minority of dealers make a business of preying on customers. As stated in the general conclusions of the Interim Committee Report: "A small minority of automobile dealers are conducting their businesses in such a manner as to endanger public trust in the doing of business by all dealers, and as to inflict serious economic suffering upon their consumer victims." (Interim Committee Report, *supra*, at p. 38.) "The abuses uncovered by the committee include unethical business methods [and] fraud . . . ." (*Ibid.*) Abuses also include transactions falling "just short of fraud." (Kohlman, *The 1961 Rees-Levering Act: Caveat Venditor* (1962) 3 Santa Clara L.Rev 76.) There are "some automobile dealers . . . who [seek] not to render an honest service but, rather, deliberately to overreach, oppress and mulct any trusting customer. Because a law must be universal in its application to any class, and because it must be drafted to govern the acts of the worst offender in the class, it follows that all members of the class, the great majority of whom are honest and respected automobile dealers, some of them probably serving the third or fourth generation of appreciative customers, must suffer the inconvenience of being scrupulously careful in the preparation of contracts, in the

22

performance of all things required by the subject legislation, and in keeping a record of the same." (*Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23, 34.)

Here, Dealer's conduct confirms our worst stereotype of used car salesmen. Unabashedly, Dealer repossessed the cars in question, resold the vehicles to new buyers, retained Davis' and Phillips' entire down payments despite the women's entreaties for the money's return, and challenged the women to sue it in court. The ALJ found that Dealer "failed to establish a valid basis for its refusal to refund the down payments . . . ." Stated another way, Dealer failed to establish a default by either Davis or Phillips under the terms of the contract. They simply failed to qualify for the loan, not an event of default under the contracts. The DMV investigator advised Torres that the investigator did not want to hurt him but merely wanted Torres to return Davis' and Phillips' down payments. Torres refused, standing fast in his position that the contract and the Act condoned his behavior.

Dealer relies full throatedly on *Kunert*. But *Kunert* does not authorize Dealer's misconduct. Rather, the harm complained of in *Kunert* was dealer participation, which has been unsuccessfully challenged in courts across the country (Kelley, Jr., et al., *APR Splits: Still Legal After All These Years*, *supra*, 56 Consumer Fin. L.Q. Rep. at p. 297) and is not an evil targeted by the Act (*Kunert, supra,* 110 Cal.App.4th at p. 257). In contrast, Dealer's practice of wrongfully withholding down payments falls squarely within the consumer protection the Act was intended to provide.

Dealer also relies on the "integrated written contracts at issue." But, as discussed above, Dealer did not exercise its right under the essential contractual provision involved here — i.e., the seller's right to cancel. That provision is the only contractual remedy available upon a failure to obtain financing, and the exercise of that remedy plainly required Dealer to return Davis' and Phillips' down payments when financing failed. Dealer's inability to assign the contract is not a buyer's "default" as defined in the contract. In Torres' interviews with the DMV investigator, he confirmed the sales were

23

"unwound" because the customers could not get financing. As noted, the ALJ found Dealer "failed to establish a valid basis for its refusal to refund the down payments made by Davis and Phillips when [Dealer] unwound the vehicle sales transactions after [Financier] declined to finance the vehicles."[14] Thus, if Dealer considered itself bound by each contract upon the document's execution by the parties, Dealer's only remedy when it discovered its inability to assign the contract was to cancel the contract *pursuant to the seller's right to cancel provision*.

DMV contends Torres is "sophisticated . . . and took advantage of vulnerable customers by constructing sales transactions to purposely evade the consumer protections the [Act] was intended to provide." "California courts have often in the past considered, recognized, and declared illegal, schemes whereby automobile dealers have attempted to evade the provisions of controlling legislation." (*Hernandez*, *supra*, 105 Cal.App.3d at p. 78.) The ALJ differentiated the transactions here from those in *Kunert* at least in part on the basis that in *Kunert*, "none of the transactions was structured to evade the consumer protections in the . . . Act." Viewing the substance of the transactions, we conclude they were not bona fide credit sales, but rather attempted seller assisted loans subject to subdivision (d).

We do not expect our holding to unleash the "massive litigation flow" threatened by Dealer. We doubt there are many dealers who routinely sell to buyers unlikely to qualify for conventional financing; repossess the vehicles when credit

---

[14] Dealer is adamant in its briefing on appeal that the relevant facts are undisputed. In its opening brief in support of its petition for writ of mandate, Dealer chose *not* to raise the issue of whether the buyers defaulted under the contract, stating: "Special note: Petitioner has chosen not to submit points and authorities on the issue of whether the buyers were in default and whether the repossession of the two vehicles was proper, despite there having been some minimal evidence presented on this issue at the hearing. The propriety of the repossessions is a civil issue between the buyer and seller and was never alleged to have been a ground for administrative discipline. The only issue is whether one of the three [Civil Code] sections applies to the facts, requiring an automatic refund of down payments, regardless of why an assignment did not occur."

24

applications are denied; keep the customers' down payments; and resell the vehicles to the next group of vulnerable consumers in need of transportation.  Furthermore, as the legislative history of subdivision (d) reveals, automobile dealers themselves requested the Legislature to authorize seller-assisted loans.  This reveals that, if the automobile dealers consider themselves aggrieved, they are not without recourse to change the law.

The Legislature has tasked DMV with policing automobile dealers and ensuring their compliance with the Act.  (Veh. Code, § 11705, subd. (a)(12).)  We would be remiss if we failed to alert the Legislature of the need for an express provision in the Act prohibiting a dealer from wrongfully retaining a down payment (including a vehicle trade-in) in the event the seller repossesses the car due to the buyer's inability to qualify for financing.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover costs on appeal.


IKOLA, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.


25